**UNITED STATES of America**

v.

**Larry KOPP, Appellant.**

**No. 91–5453.**

United States Court of Appeals, Third Circuit.

Argued Sept. 19, 1991.

Decided Dec. 4, 1991.

As Amended Feb. 18, 1992.

Order on Denial of Rehearing and Rehearing En Banc Feb. 18, 1992.

Michael Chertoff, U.S. Atty., Daniel J. Gibbons (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Before BECKER and HUTCHINSON, Circuit Judges, and FULLAM, District Judge.*

## OPINION OF THE COURT

BECKER, Circuit Judge.

Defendant Larry Kopp pled guilty to procuring a $13.75 million bank loan by fraudulent misrepresentations, in violation of 18 U.S.C. § 1344 (1988) (subsequently amended). The district court for the District of New Jersey sentenced him to a term of 33 months in prison. In calculating the sentence under United States Sentencing Guideline ("USSG") § 2F1.1, the district court had to determine, as a specific offense characteristic, the amount of the "loss." The defendant argued that the "loss" was zero (and therefore that no offense level increase was necessary) on the following grounds: (1) the bank's actual loss was nil because the bank later sold the security for the loan for more than the loan balance; (2) even if the bank did incur an out-of-pocket loss, such loss resulted from misconduct by the bank and the defendant's nephew David Kopp, thus the defendant was not responsible for any actual loss; and (3) the defendant did not intend to inflict any loss on the bank. The court rejected the defendant's position and also declined to accept the probation officer's calculation that the bank's actual loss was only $3.4 million (an estimate which also took into account operating expenses, lost interest, and the cost of a low-interest loan to the new purchaser). Instead, the court agreed with the government that the "loss" was the amount that the defendant fraudulently obtained (the full $13.75 million face value of the loan), thereby increasing the offense level by eleven levels and the applicable sentence range to 30–37 months.

James A. Plaisted (argued), Walter, Sondak, Berkeley & Brogan, P.A., Roseland, N.J., for appellant.

* The Honorable John P. Fullam, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

The defendant's appeal from the judgment of sentence requires us to decide how to apply the fraud guideline in this context, a question on which other circuits have split. For the reasons that follow, we conclude that the district court erred in fixing the "loss" as the face value of the loan. Rather, we hold that the district court should have calculated the "loss" as actual loss, substituting intended or probable loss if either amount was higher and determinable. In our view, the court's error stemmed in part from its failure to recognize fundamental differences between theft and fraud crimes, differences which the sentencing guidelines covering the two types of offenses take into account. We further hold that the guideline "loss" should not be reduced simply because the bank or David Kopp may have augmented it. When sentencing, the district court may, however, depart downward if any such augmentation caused the properly calculated "loss" to overstate the seriousness of the offense. Correspondingly, if the court finds that the "loss" understates the seriousness of the offense (which might be the case if actual and intended loss were zero and the risk of loss were significant), it may depart upward, so long as the sentence does not exceed the statutory maximum, in this case five years' imprisonment.[1] Because the district court made no findings on actual or intended loss, we will vacate the judgment of sentence and remand for resentencing. That court remains free not only to recalculate the "loss," but also to reevaluate other facts pertinent to its decision whether to depart from the guideline range.

The defendant also raises several other issues. He objects to added offense levels for more than minimal planning and for a supervisory role, and he complains that the district court should have granted him an offense level reduction for minor participation. We find these arguments without merit. He also alleges that the district court improperly refused to depart downward from the guideline range based on a misconception of its legal ability to do so. Because the district court is free to revisit the departure issues on remand, we need not reach that issue.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The Offense*

In the early 1980s, the defendant and his brother, Marvin Kopp, began a real estate development business, which they operated through various corporations and partnerships. The seed capital came largely from the family of Barbara Kopp, the defendant's wife. In November 1984, Marvin Kopp died, and, as the business faced ever more severe financial problems, disputes arose between the defendant on one side and Marvin Kopp's widow Judith Kopp and her son David Kopp on the other.[2] By the spring of 1987, David Kopp had become the managing partner, although the defendant remained involved. Financial difficulties, however, continued, even though the Kopps sank still more of their own funds into the partnerships.

In August 1987, the Kopp partnership began to negotiate with Ensign Bank, FSB ("the bank") for a $14 million loan, $12.3 million of which was necessary to refinance a shopping mall owned by one of the real estate partnerships. The refinancing was apparently required because an earlier

---

1. The defendant's offense included conduct that occurred between November 15, 1987 and January 31, 1988. The bank fraud statute, 18 U.S.C. § 1344, has since been revised to raise the maximum sentence from 5 years or $10,000 to 30 years or $1 million, see 18 U.S.C.A. § 1344 (West Supp 1991), but those changes do not apply to the defendant here.

2. For example, Judith Kopp accused the defendant of preparing a fraudulent power of attorney and of forging the signatures of Judith Kopp and her children to obtain $1.3 million in

loans secured by property in which Judith Kopp and her children were partners. The grand jury returned charges against the defendant as a result of these allegations (as well as certain other alleged crimes related to his real estate dealings). Those charges, which had earlier nearly led to a civil suit and which the defendant still vigorously denies, were dismissed as part of the bargain surrounding the defendant's guilty plea to the fraud charge discussed in this opinion, and they were not taken into consideration in his sentencing.

lender, having discovered that the Kopps had obtained a second mortgage on the property without permission, was about to declare a default. To induce the bank to make the loan, Stuart Sherer, the Kopp partnership's office manager, prepared and signed false leases and estoppel letters[3] that inflated the true amount of rental income the shopping center was then generating. The defendant was aware of the fraudulent inducement of the bank loan and, Sherer claims, personally directed the forgeries. The defendant also personally certified two rent rolls he knew to be false. The misrepresentations suggested that the shopping center was fully occupied and that the rental income stream would be sufficient to cover the mortgage payments on the loan, neither of which was true.

Relying on the misrepresentations, the bank loaned the Kopp partnership $13 million in December 1987 and $750,000 more in January 1988. Apparently the debt-service ratio was insufficient to collect the remaining $250,000 of the $14 million loan commitment. To obtain the first installment, Sherer, with the defendant's knowledge, submitted five forged leases and twenty-one forged estoppel letters, along with three more leases that the partners knew would be broken by tenants. To obtain the second installment, Sherer further submitted a lease that overstated the rent due, as well as a new forged estoppel letter and an updated fraudulent rent roll.

### B. *The Default and the Bank's Actual Loss*

The loan went into default in February 1988: no payments were made after the second loan installment was received. The defendant blames the failure to repay in part on David Kopp's diversion of partnership money and his failure to collect all amounts receivable. The government doubts that the defendant ever intended that the loan be repaid. In any event, the bank demanded and received a deed in lieu

of foreclosure and eventually sold the property for $14.5 million, $750,000 more than the face value of the loan. The bank nonetheless calculated that it actually lost approximately $3.4 million overall, due to lost interest ($1.5 million), the bank's operating expenses when taking over the property ($0.4 million), and the cost of a low-interest loan to the new purchaser ($2.3 million).

The defendant, however, contends that the $3.4 million actual loss estimate was overstated and that any actual loss was a result of misconduct by David Kopp and bank officer Brian Maloney. He called a real estate appraiser, who testified that the value of the foreclosed property was at least $17.5 million, $3 million more than the sale price. He also introduced evidence that the lower sale price and a linked low-interest loan were due to an unethical "sweetheart" deal between the bank (in the person of Maloney) and David Kopp. The bank wanted control over the shopping center more quickly, so sought a deed from both Kopps in lieu of foreclosure. The defendant alleges that to obtain rapid title, Maloney secretly agreed to steer the resale to David Kopp's friend Clifford Streit, who in turn would give David Kopp back a 25% interest in the property.[4] The defendant claims that he was trying to arrange a profitable sale to third parties at that time but consented to giving the bank the deed when Maloney falsely told him there would be no criminal referral if he agreed. Pursuant to the secret exclusive option deal, the bank sold the property to Streit and his hidden partner David Kopp for below-market value. This underhandedness, the defendant continues, also led to an unnecessary low-interest loan, with the result that the bank's loss, if any, was inflated.

The defendant also claims that the actual loss figure of $3.4 million was improperly calculated, even given the way the resale took place. He argues that Maloney, who made that calculation, had an incentive to distort it because of Maloney's own miscon-

---

**3.** Estoppel letters are letters that tenants sign that serve to estop them from later disputing the amount of rent they owe under their leases.

**4.** According to the defendant, Maloney misled the bank's board of directors into believing that Clifford Streit's partner was one Dan Crown, rather than David Kopp.

duct. Moreover, he contends, the bank's own remaining records [5] show that the bank recorded an operating surplus on the property, not a $400,000 deficit, and fail to support the claimed $1.5 million in lost interest on the bad loan. Finally, the defendant asserts that the operating surplus would have been higher but for the bank's failure to credit rents received in June and July, 1988 and the bank's payment of $15,-000 to the defendant and his wife for their equity interest. In short, the defendant claims that if the resale had not been tainted by misconduct, the bank would have profited, and that even as events transpired, the bank's actual loss was far less than $3.4 million.

## C. *The Criminal Proceedings*

The federal authorities discovered the fraud in May 1988, when David Kopp reported the offense, admitted his complicity, and agreed to cooperate in prosecuting Stuart Sherer and his uncle, the defendant. David Kopp began secretly to record his conversations with the other conspirators. Confronted with the recordings, Sherer later agreed to cooperate and record additional conversations with the defendant. On August 8, 1989, the defendant was indicted for, among other things, one count of bank fraud under 18 U.S.C. § 1344 and one count of conspiracy to commit bank fraud. On June 11, 1990, under a plea bargain, the defendant pled guilty to those counts; the remaining ten counts, five of which related to other alleged crimes, were dropped.

The U.S. Probation Office submitted a Presentence Investigation Report on September 10, 1990, which adopted the bank's estimate of $3.4 million in out-of-pocket loss as the "loss" for purposes of U.S.S.G. § 2F1.1, the applicable sentencing guideline. Both parties objected. The government claimed that because the bank would not have made the loan at all had it known the truth, the defendant fraudulently obtained $13.75 million, which was therefore the proper measure of the "loss." [6] The defendant argued, as discussed above, that the "loss" was zero. The district court held hearings on the defendant's objections on October 25 and November 2 and 5, 1990, but ruled on April 30, 1991, that the full $13.75 million the defendant put at risk was the appropriate measure of loss. Hence an increase of eleven offense levels was required under original U.S.S.G. § 2F1.1 because the "loss" exceeded $5 million.[7] On May 17, 1991, the district court sentenced the defendant to 33 months in prison (roughly in the middle of the guideline range) for the reasons stated in its April 30, 1991 opinion. The defendant filed a timely appeal.

The impact of the challenged ruling is significant. Because the defendant had no prior criminal record, if the "loss" was zero (as he claims), the sentencing range would drop from the 30–37 months that the district court considered to a range of 2–8 months. If the district court also found that no upward departure was warranted, it might have elected to impose probation conditioned on a combination of community confinement, home detention, or intermit-

---

**5.** Apparently some of the bank's income/expense records, including some that Maloney claims to have relied on, were "purged" and are no longer available.

**6.** It is unclear how much of the defendant's version the government contests. The Presentence Investigation Report adopted the bank's claimed out-of-pocket loss of $3.4 million as the "loss." Under the government's theory, which the district court endorsed, the "loss" was the face value of the loan (the $13.75 million received as a result of the fraud). The government (at least on appeal) therefore had little reason to challenge the defendant's claims that the victim's actual loss was miscalculated or overstated because of misfeasance by others.

The government did suggest that to the extent the bank's out-of-pocket loss was misestimated, the $3.4 million figure is too low.

**7.** The base level for offenses of fraud and deceit is six. U.S.S.G. § 2F1.1(a). The defendant received two two-level increases for his supervisory role and more than minimal planning, and he received a two-level decrease for acceptance of responsibility. He was denied a two-level decrease for minor participation. Although those rulings were also appealed, see note 21, the primary issue on this appeal is the 11–*level* increase. The court also denied the government's request for an upward departure because the "loss" substantially exceeded $5 million, but that denial is not contested on this appeal.

tent confinement under U.S.S.G. §§ 5B1.1 and 5C1.1(c), rather than continuous incarceration in prison. For this reason, the defendant sought bail pending appeal from the district court. The district court agreed that the defendant was not dangerous, was unlikely to flee, and that the grounds for appeal were substantial. It stated that if this court did reverse, the probable reduction would be eleven levels, leaving the sentence range at 2–8 months. It therefore ordered the defendant to begin serving an eight-month sentence on July 8, 1991, noting its inclination to impose the maximum in that range if resentencing proved necessary. It further ordered that bail pending appeal would be granted only if no decision from this court came down in eight months.

The defendant then sought bail pending appeal from this court. A motions panel denied that request without prejudice to reconsideration after hearing the merits. After hearing oral argument and anticipating the probable outcome on the merits, we issued an order granting the defendant bail pending our final decision and eventual resentencing.

## II. DEFINITION OF "LOSS" IN THE FRAUD GUIDELINE

### A. *Analysis of U.S.S.G. § 2F1.1 as It Was in Effect at Sentencing*

■ The guideline in effect here is a combination of the fraud guideline in effect

at the time of sentencing and the original fraud guideline in effect at the time of the crime. As a general rule, sentencing courts must apply the guidelines in effect at the time of sentencing, not the time of the crime. See 18 U.S.C.A. § 3553(a)(4), (5) (West 1985 & Supp 1991); *United States v. Cianscewski,* 894 F.2d 74, 77 n. 6 (3d Cir. 1990). But where such retroactivity results in harsher penalties, Ex Post Facto Clause problems arise, and courts must apply the earlier version. See *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); see also *United States v. Underwood,* 938 F.2d 1086, 1090 (10th Cir.1991); *United States v. Morrow,* 925 F.2d 779, 782 (4th Cir.1991). We consequently review the district court's decision for consistency with the guidelines in effect on May 17, 1991, the date of sentencing, except where amendments since the time of the crime would yield a harsher result.

The version of the fraud guideline, U.S.S.G. § 2F1.1(b)(1), that is in effect here reads:

If the loss exceeded $2,000, increase the offense level as follows:

| Loss | Increase in Level |
| --- | --- |
| (A) $2,000 or less | no increase |
| ... | |
| (K) $2,000,001—$5,000,000 | add 10 |
| (L) over $5,000,000 | add 11 [8] |

■ The official Commentary provides some further guidance as to the calculation

**8.** As originally written, U.S.S.G. § 2F1.1(b)(1) directed the sentencing court to increase the offense level above the base offense level of six according to the amount of "estimated, probable, or intended loss." But effective June 15, 1988, the Commission amended the text of U.S.S.G. § 2F1.1(b)(1) to delete "estimated, probable, or intended" immediately before "loss." United States Sentencing Commission, *Guidelines Manual Appendix C* 10 (amendment 30) (Nov.1991) ("*1991 Guidelines Manual Appendix C*"). The Commission described the amendment as a clarification, id, and on its face the change was not necessarily substantive. Because the official Commentary to U.S.S.G. § 2F1.1 retained its original discussion of types of losses (including actual, estimated, probable, and intended losses), we agree with the Ninth Circuit that this portion of the amendment was editorial. See *United States v. Wilson,* 900 F.2d 1350, 1355 (9th Cir.1990). Applying it here therefore raises no ex post facto concerns.

On the other hand, effective November 1, 1989, the Commission revised the "loss" table for "losses" over $40,000, such that for the same "loss" amount the offense level is greater. See *1991 Guidelines Manual Appendix C* at 70–71 (amendment 154). This change was clearly substantive, and applying the stricter punishments retroactively would violate the Ex Post Facto Clause. Therefore, as both parties agree, the original, unamended table applies.

One other presentencing change to the guideline is also inapplicable here because of ex post facto problems. Effective November 1, 1990, as a result of a statutory directive, fraud "substantially jeopardiz[ing] the safety and soundness of a financial institution" yields an additional four-level increase, at minimum to level 24. See U.S.S.G. § 2F1.1(b)(6); *1991 Guidelines Manual Appendix C* at 146–47 (amendment 317). This amendment too was obviously not a clarification of ambiguous earlier language, and applying its stricter punishment retroactively would

of a "loss" and the difference between various types of losses. The version of Application Note 7 in effect at sentencing [9] read:

> Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss. For example, if the fraud consisted of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the "loss" would be treated as $40,000 for purposes of this guideline.

Application Note 8 explained the process of estimating a "loss":

> The amount of loss need not be precise. The court is not expected to identify each victim and the loss he suffered to arrive at an exact figure. The court need only make a reasonable estimate of the range of loss, given the available information. The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature or duration of the fraud and the revenues generated by similar operations.... The offender's gross gain from committing the fraud is an alternative estimate that ordinarily will understate the loss.

The Commentary also discussed possible upward or downward departures. Application Note 9 provided that where "[d]ollar loss ... does not fully capture the harmfulness and seriousness of the conduct ... an upward departure may be warranted." In contrast, Application Note 10 [10] discussed possible downward departures:

> In a few instances, the total dollar loss that results from the offense may overstate its seriousness. Such situations typically occur when a misrepresentation is of limited materiality or is not the sole cause of the loss. Examples would include understating debts to a limited degree in order to obtain a substantial loan which the defendant genuinely expected to repay.... In such instances, a downward departure may be warranted.

As have most courts, we begin our interpretation of "loss" under the fraud guideline with Application Note 7's cross-refer-

---

violate the Ex Post Facto Clause. Neither party suggests that it applies here.

Finally, the Commission also amended U.S.S.G. § 2F1.1(b)(2)–(5) effective November 1, 1989, but those changes are irrelevant to this appeal. See *1991 Guidelines Manual Appendix C* at 71–72 (amendment 156). We will discuss relevant amendments to the official Commentary as we discuss each application note.

**9.** Application Note 7 has since been amended effective November 1, 1991, well after the sentencing date. See *1991 Guidelines Manual Appendix C* at 221–23 (amendment 393). The revised and expanded version has a specific discussion of "loss" calculation in cases of fraudulently induced bank loans. Resolution of this case would be much simpler if the new version applied not only prospectively but also retroactively (in the sense of suggesting the Commission's intent in the earlier version). Although the use of such "subsequent legislative history" to interpret earlier legislative acts is common, it is also extremely controversial and under increasing criticism from the Supreme Court. See, for example, *Chapman v. United States*, — U.S. — , 111 S.Ct. 1919, 1927 n. 4, 114 L.Ed.2d 524 (1991); *Sullivan v. Finkelstein*, 496 U.S. 617, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (Scalia concurring in part). Accordingly, out of caution, we will first interpret the original guideline *without regard to the subsequent amendments* and only then, in Part II.C, turn to the amendments, which in fact confirm our original interpretation. We therefore need not address the subtle and difficult question of when resort to subsequent legislative history is proper.

**10.** Original Application Note 10 cautioned that "[t]he adjustments for loss do not distinguish frauds involving losses greater than $5,000,000. Departure above the applicable guideline may be warranted if the loss substantially exceeds that amount." See *1991 Guidelines Manual Appendix C* at 72 (amendment 156). This Note was deleted when the original "loss" table was revised and what were originally Application Notes 11–14 were renumbered as 10–13. Id. Original Application Note 10 still applies here because the original "loss" table is in effect, but because the district court declined to depart upward on this ground, it is irrelevant in this appeal. Because there will be no ambiguity, and for convenience and comparability to other courts' decisions, we will refer to the application notes as numbered at the time of sentencing.

ence to the theft guideline Commentary. At the time of sentencing, Application Note 2 to U.S.S.G. § 2B1.1 (the theft guideline) read:

> "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.... In cases of partially completed conduct, the loss is to be determined in accordance with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy). *E.g.,* in the case of the theft of a government check or money order, loss refers to the loss that would have occurred if the check or money order had been cashed. Similarly, if a defendant is apprehended in the process of taking a vehicle, the loss refers to the value of the vehicle even if the vehicle is recovered immediately.[11]

The Background to U.S.S.G. § 2B1.1 continued: "The value of the property taken plays an important role in determining sentences for theft offenses, because it is an indicator of both the harm to the victim and the gain to the defendant."

The government seizes upon the first sentence of Application Note 2 to the theft guideline, which equates the "loss" with the value "taken." The government claims that the defendant "took" $13.75 million that was not rightfully his, because, as proved at the hearing, the bank would have lent him nothing if it had known the true monetary condition of the shopping center.[12] Furthermore, the government correctly notes, under Application Note 2 to the theft guideline, theft "loss" is not affected by recovery of any of the property stolen. See, for example, *United States v. Chiarelli,* 898 F.2d 373, 384 (3d Cir.1990); *United States v. Cianscewski,* 894 F.2d 74, 80–81 (3d Cir.1990). The government therefore concludes that only the defendant's conduct matters to "loss" calculation, and that the fortuity of recovery and other aspects affecting actual loss to the victim are irrelevant.

But the analysis is not so simple. Even the theft guideline is not entirely perpetrator-oriented. The Commentary to U.S.S.G. § 2B1.1 focuses significantly on the victim's loss, as well as the perpetrator's gain. Replacement cost to the victim may be used to measure theft "loss" where the market value of the stolen property is difficult to ascertain or inadequate to measure harm to the victim. And the Background to U.S.S.G. § 2B1.1 emphasizes that "loss" measures *both* harm to the victim and gain to the defendant.

More basically, however, U.S.S.G. § 2B1.1 is, by definition, a theft guideline, and fraud differs from theft. In this case,

---

**11.** The fraud guideline's cross-reference to the theft guideline and the theft guideline's expanded discussion of "loss" both took effect on June 15, 1988, after the crime in this case. We discuss (and dismiss) possible ex post facto concerns about that amendment in note 14. In brief, we conclude that the cross-reference did not change fraud "loss" calculation, even though it appears to at first glance.

It is also worth noting that the Commission has recently revised Application Note 2 to U.S.S.G. § 2B1.1 effective November 1, 1991. See *1991 Guidelines Manual Appendix C* at 221 (amendment 393). Those changes appear to be editorial only.

**12.** The government's theory is not that the face value of a fraudulently obtained loan is *always* the proper measure of the "loss." Rather, it argues that the face value is the proper measure where, as here, the government has proved that

absent the fraud, the bank would have lent no money. Presumably, under the government's theory, if (knowing the truth) the bank would have lent the Kopp partnership, say, $5 million, then the "loss" would have been the extra $8.75 million ($13.75 million − $5 million) fraudulently obtained. It is not clear how the government would define a "loss" where a bank would have lent the fraud perpetrator the same amount, but at a higher interest rate.

In this case, the government argues that had the bank known the true income from the property it would only have lent at most $10.2 million, based solely on standard debt service ratios. In actuality, however, the bank would have refused to lend at all, says the government, because of pre-existing liens far greater than $10.2 million and because of insufficient estoppel letters and other problems with vacancies, maintenance, etc. The district court found that the evidence supported these conclusions.

for example, the defendant did fraudulently obtain $13.75 million, but in so doing he simultaneously gave a mortgage on the property—an obligation that eventually forced him to forfeit the collateral to the bank. He did not "take" $13.75 million for nothing, as a thief would. Furthermore, all thefts involve an intent to deprive the victim of the value of the property taken. As the Seventh Circuit has noted, the same is not always true for fraud: some fraud involves an intent to walk away with the full amount fraudulently obtained, while other fraud is committed to obtain a contract the fraud perpetrator intends to perform. See *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir.1991) (noting that a bilking con artist differs greatly from a contract bidder who misstates its qualifications but intends to perform).

Mechanical application of the theft guideline in fraud cases would frustrate the legislative purpose of the guidelines and contravene the specific language of the Commission. The sentencing guideline system was designed to sentence similarly situated defendants similarly; basing all fraud sentences on a simple "amount taken" rule without regard to actual or intended harm would contravene that purpose. We think it plain that actual harm is generally relevant to the proper sentence. More importantly, Congress has explicitly said so in 28 U.S.C.A. § 994(c)(3) (West Supp.1991), which directs the Commission to take "the nature and degree of the harm caused by the offense" into account in its guidelines. See also U.S.S.G. § 1B1.3(a)(3) (factors that determine guideline ranges include actual and intended harm).

Indeed, the fraud guideline does reflect the differences between theft and fraud and between the types of fraud. Even after the June 15, 1988 amendment, fraud guideline analysis only begins and does not end with the discussion of "loss" in the theft guideline. The revised Application Note 7 to U.S.S.G. § 2F1.1 does not say that the definitions of "loss" for theft and fraud crimes are identical, just that "[v]aluation of loss *is discussed* in the Commentary to § 2B1.1 ..." (emphasis added). While the calculations under the two guidelines are essentially consistent, the fraud analysis is slightly (and crucially, here) more complicated, as a detailed analysis of the *entire* fraud guideline Commentary reveals. We part company with several other circuits and join ranks with the Seventh Circuit largely because we decline to impose an identical analysis for theft and fraud crimes in all cases. Compare *United States v. Brach*, 942 F.2d 141, 143 (2d Cir.1991) (applying theft analysis to fraud crime with no qualification), and *United States v. Johnson* 941 F.2d 1102, 1113–15 (10th Cir.1991) (same), with *United States v. Schneider*, 930 F.2d 555, 558–59 (7th Cir.1991) ("simple" but "irrational" to treat all frauds the same, whether or not the defendant intended to walk away with the face value). See generally Part II.B at 532–534.

The remainder of Application Note 7 to U.S.S.G. § 2F1.1 (which was part of the original Commentary) made a critical distinction between actual, probable, and intended loss. Under Application Note 7 as in effect here, "if a probable loss or intended loss ... can be determined, that figure would be used if it was larger than the actual loss." Consistent with the ordinary meaning of "loss," sentencing courts were to use the victim's actual loss as the basic "loss" under the fraud guideline. But, consistent with the guidelines' overall theory of culpability for attempts, see U.S.S.G. § 2X1.1, courts were to switch to either "probable" or "intended" loss if either was both reasonably calculable (as discussed in Application Note 8) and higher. The fraud guideline thus has never endorsed sentencing based on the worst-case scenario *potential* loss (here, the face value of the loan). See also U.S.S.G. § 1B1.3 appl. note 4 (fraud guideline only refers to actual, attempted, or intended harm, hence risk of harm enters only into the *base* offense level and the possibility of an upward departure).

This plain reading of Application Note 7 is in fact consistent with the cross-reference to the theft guideline. *In both theft and fraud cases, the guideline "loss" turns out to be the higher of the actual loss and the intended loss.* Admittedly, the theft guideline does not state this approach in terms. But in a theft case, the

thief *intends* to steal whatever he or she takes; the amount taken is the loss the defendant intended to inflict (even though the defendant may not have known exactly the value on the market or to the victim of the things taken). Although the theft guideline does not tell the sentencing court to compare actual and intended loss, as the fraud guideline Commentary explictly does, no comparison is necessary. In a theft case, unlike a fraud case, the amount taken (the intended loss) is always as high or higher than the amount the victim actually lost (which may be reduced due to fortuitous recovery of the stolen property).[13] Our interpretation of the fraud guideline therefore harmonizes with the approach of the theft guideline.[14]

Aside from the cross-reference to the theft guideline, the only support in the fraud guideline for the government's position comes from Application Note 8. That

Note primarily emphasizes that the "loss" need not be estimated with precision, but the version in effect at the time of sentencing did end with the statement that "[t]he offender's *gross gain* from committing the fraud is an alternative estimate that ordinarily will understate the loss" (emphasis added).[15] The government suggests that the "gross gain" here was the $13.75 million that the defendant obtained but would not have received had he not committed fraud, and that $13.75 million is an appropriate alternative estimate of the "loss." Although that interpretation seems sensible, we reject the use of an *alternative estimate* when, as here, the true "loss" is measurable. Application Note 8 primarily addresses "loss" *estimation,* not the proper *definition* of "loss," which is discussed in Application Note 7.

The government also relies on original Application Note 11, which noted that "a downward departure may be warranted"

**13.** We can imagine one situation where our reconciliation of U.S.S.G. §§ 2B1.1 and 2F1.1 might fail, however. U.S.S.G. § 2B1.1 also covers embezzlement crimes. Conceivably, an embezzler might secret away $10,000 in office funds to invest in a reputable stock, truly intending and hoping to return the amount taken (plus interest) after selling the stock. Under a literal reading of U.S.S.G. § 2B1.1, "loss" is the "amount taken," $10,000 in our example. In that case intended loss would be zero, and actual loss might also be zero. But if U.S.S.G. § 2F1.1 applied (it would not), under our interpretation "loss" would be zero, and no sentence enhancement would apply. However, embezzlement, unlike ordinary theft or fraud, involves not only a taking but also an action akin to a breach of fiduciary duty, which might justify always using the amount taken as "loss." In any event, our general point remains that in many cases the approaches of the fraud and theft guidelines are consistent. The cross-reference between the fraud and theft guidelines therefore makes sense, even if "loss" calculation is not identical in every case.

**14.** In any event, it is uncontestable that on a plain reading of the *original* Application Note 7 (without the cross-reference), fraud "loss" was to be calculated in the manner suggested here. The Commission added the cross-reference to the theft guideline and its simultaneously updated Commentary on "loss" calculation as part of the same June 15, 1988 amendment that deleted "estimated, probable, or intended" from the text of the fraud guideline. See *1991 Guideline Manual Appendix C* at 5, 10 (amendments 7, 30). Thus the cross-reference was added after the criminal conduct here. If the amendment substantively changed the definition of fraud guide-

line "loss," as would be the case if the government were correct, we would have an ex post facto problem in this case.

We think that the amendment did not change fraud "loss" calculation, and hence the ex post facto concern disappears. The Commission's stated purpose in amending the fraud guideline was to "clarify the guideline in respect to the determination of loss." Id at 10 (amendment 30). We find no reason to doubt that explanation, although we fear that the Commission only succeeded in confusing courts further. See Part II.B at 532–534 (discussing the case law interpreting the revised guideline). In our view, both before and after the amendment, courts imposing sentences for fraud were supposed to use actual loss, substituting "probable or intended loss" where higher and measurable.

**15.** Interestingly, the Sentencing Commission has recently amended Application Note 8 effective November 1, 1991. See *1991 Guidelines Manual Appendix C* at 221, 223 (amendment 393). Although the reference to "an alternative estimate that ordinarily will underestimate the loss" remains, the troublesome phrase "offender's gross gain" has been replaced by the equally ambiguous "offender's gain."

Separately, but related to the "gross gain" issue, the Commission has followed Congress's statutory instruction to raise the penalties for major bank fraud, specifically including cases where the defendant reaped more than $1,000,-000 in "gross receipts" from the offense. See id at 184–85 (amendment 364). That amendment is subsequent legislative history because it took effect after the sentencing here. We discuss its implications below. See Part II.C at 534–536.

when "a misrepresentation is of limited materiality or is not the sole cause of the loss." Indeed, one example given is comparable to this case: where a defendant "understat[es] debts to a limited degree in order to obtain a substantial loan which the defendant genuinely expect[s] to repay," the court may decide to depart downward. The district court concluded that the use of "substantial loan" in the Application Note suggests that the drafters had the full amount of the loan in mind as the "loss," and to the extent that this "loss" measure was overstated, the court could depart downward (although it chose not to). We disagree. Application Note 11 discussed downward departures, not the calculation of "loss" in the first instance. We think that the Commission was emphasizing the defendant's lack of culpability—his or her "limited degree" of understatement and his or her intent to repay—as a basis for downward departure, rather than suggesting an alternative definition of "loss."

The government is correct on one point, however: Application Note 11 definitively rejected adjusting the "loss" itself downward to reflect other causes beyond the defendant's control. As an example of when the dollar loss may overstate the seriousness of the offense and hence a downward departure may be appropriate, Application Note 11 included situations where the "misrepresentation . . . is not the sole cause of the loss." Application Note 11 made it clear that actual loss was how much better off the victim would be but for the defendant's fraud. To the extent actual loss had other, more proximate causes, a discretionary downward departure—but not a mandatory "loss" adjustment—might be appropriate. Here, then, the district court might conclude that the defendant deserves a downward departure due to misconduct by David Kopp and Brian Maloney, but the level of the "loss" itself would remain unaffected.

The foregoing analysis leads to the conclusion that the fraud guideline defines "loss" primarily as the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost. Under the guideline in effect at sentencing, the "loss" should have been revised upward to the amount of loss that the defendant intended to inflict on the victim, or to the amount of probable loss,[16] if either intended or probable loss was estimable and higher. Before finally adopting this view, however, we will survey the case law interpreting "loss" calculation under the fraud guideline to see if it affects our tentative conclusion.

## B. *The Case Law*

One other circuit, the Seventh, is on record with a similar interpretation of

16. "*Probable loss*" *itself is an ambiguous term.* "Probable loss" could be measured as of the time of the crime. This measure would make sense in a case where a sizeable loss was objectively predictable at the time, but the crime was interrupted and actual loss was minimal. On the other hand, the intended loss measure handles the problem of fortuitous recoveries that reduce actual loss. The "probable loss" measure would only matter in the rare case where the defendant subjectively intended no loss but objective circumstances made to the victim loss likely.

"Probable loss" could also mean the amount the victim is eventually likely to lose, viewed from the time of sentencing. This measure would make sense where at the time of sentencing the victim has only incurred a fraction of its ultimate actual loss, and therefore actual loss thus far is an understatement of the true harm to the victim. On the other hand, under Application Note 8, "actual loss" need only be reasonably estimated, and it would certainly be reasonable to include probable but as yet unrealized losses as actual losses.

There is little case law on the subject. Compare *United States v. Davis*, 922 F.2d 1385, 1392 (9th Cir.1991) (adopting first interpretation), with *United States v. Hughes*, 775 F.Supp. 348, 351 (E.D.Cal.1991) (adopting the second). Fortunately, we need not decide the issue here. Because we eventually conclude that resentencing is required here, the definition of "probable loss" becomes moot. As discussed above, when resentencing, the district court must apply the guidelines in effect at that time, unless Ex Post Facto Clause problems arise. Since the defendant's original sentencing, the Commission has revised Application Note 7 to eliminate the "probable loss" terminology in favor of "expected loss," a measure applicable only when actual loss is not fully realized. See *1991 Guideline Manual Appendix C* at 222 (amendment 393). The revised guideline will not result in a stiffer sentence for the defendant here: the "probable loss" measure could only have increased the "loss," and because the bank's net actual loss (if any) has been fully realized, the "expected loss" measure will drop out of the case. We are therefore relieved of deciding how to define "probable loss."

"loss" in fraud cases. *United States v. Schneider*, 930 F.2d 555 (7th Cir.1991), involved defendants who procured $142,400 of government contracts, but submitted fraudulent payment and performance bonds in the process. Apparently, however, they were the low bidders and would in fact have performed the contracts, as they had many others. The government claimed that the "loss" was the $142,400 face amount of the contracts obtained, but the court disagreed. The court rejected as "irrational" a holding that would apply the same sentence against a performing contractor who lied on its application as against "a con artist who intended to winkle $142,400 ... from a senile old lady." *Id.* at 559. Instead, the court held that because the Schneiders were the low bidders the government's only financial "loss" was its expenses in recontracting, which the government there had failed to prove. We agree with the Seventh Circuit's analysis and conclusion that the government's theory was simple, but irrational. The result also has underpinnings in the guideline text and Commentary themselves, as we have explained above.

To support its conclusion, the *Schneider* court cited *United States v. Whitehead*, 912 F.2d 448 (10th Cir.1990), a case that also supports our earlier reasoning. There the defendant presented fraudulent documents when renting a home and obtaining an option to purchase. The home was worth $168,000, and the government claimed that the whole amount was the "loss." The court disagreed, reasoning that Whitehead had not yet attempted to purchase the house itself, and it was uncertain that he would ever succeed in doing so, or that the full value of the home would be lost if he did. Therefore only the value of the option ($2,000) counted as the "loss." *Id.* at 451–52. We certainly agree that the "loss" was not the $168,000, although we are not certain that even the entire $2,000 option value was properly considered as "loss." [17]

We also find persuasive *United States v. Hughes*, 775 F.Supp. 348 (E.D.Cal.1991). There the defendant conspired to present false loan applications to buy three homes. Hughes, however, clearly had no intention of defaulting on the loans. Indeed, Hughes, a male friend, and their female companions lived in the homes; the payments on two loans were in good standing, and although the third house was sold in bankruptcy, it was sold at a profit. The court also found that no actual economic loss had been realized, and the government could not prove that default was probable or that any future loss was expected. Discussing U.S.S.G. § 2F1.1 and its Commentary in detail, and rejecting blind application of the theft guideline, the court found that the "loss" was zero and that no sentence enhancement was required.

The government cites a number of fraud guideline cases that appear to support its view because they upheld "loss" calculations of the full amount fraudulently obtained. On closer analysis, however, these cases do not conflict with our reasoning. For example, in *United States v. Wills*, 881 F.2d 823 (9th Cir.1989), the defendant was guilty of credit card fraud. He masterminded a scheme to take $52,000, but $25,000 from one of the transactions was recovered. The court summarily (and properly) upheld the "loss" calculation of $52,000, specifically because the defendant intended to cause a $52,000 loss. Id at 827. Similarly, in *United States v. Davis*, 922 F.2d 1385 (9th Cir.1991), Davis would call a business with an order and promise to pay by wire transfer. He would then have someone call the business and pose as a bank officer, saying that the wire transfer had arrived. He would then receive the goods. In the particular instance in the case, the actual loss was zero because jewels were never shipped. The court, however, properly held that the loss was the market value of the jewels—again specifically because the probable and intended losses were higher than actual loss. Id. at 1391–92.

The government relies most heavily on *United States v. Johnson*, 908 F.2d 396

---

**17.** Actually, it made no difference that the court included the full $2,000 as loss, because under the guidelines, "losses" of $2,000 or less result in no offense level increase. In any event, the *Whitehead* court ruled that the district court's upward departure was warranted.

(8th Cir.1990). There Johnson had a poor credit history, so she obtained false new identification and fraudulently obtained $22,000 in car loans under that new name. The court held that the full $22,000 was the proper measure of the "loss," even though the two banks involved eventually recovered most of the money by repossessing Johnson's cars, saying that "the focus for sentencing purposes should be on the amount of the possible loss which Johnson attempted to inflict on the banks." Id. at 398.

The Eighth Circuit's opinion is ambiguous, but it may in fact be consistent with our approach. Although the court did mention "possible loss," it did so only in referring to the loss that Johnson attempted (and therefore intended) to inflict. And in the next sentence, the court referred to Application Note 7's discussion of "probable or intended loss" as an alternative measure to actual loss. Id. On a reasonable reading of the case, therefore, the court held that Johnson intended to commit actions she knew would inflict the full $22,000 loss. See *Schneider*, 930 F.2d at 559 (reading *Johnson* as a case where the defendant had no intention to repay). If so, we agree with the holding, but if *Johnson* did legally equate "possible loss" with "probable or intended" loss, we must reject that linguistic stretch.

In another case also styled *United States v. Johnson*, 941 F.2d 1102 (10th Cir.1991), the Tenth Circuit unhesitatingly applied the "value of the property taken" language from U.S.S.G. § 2B1.1 Application Note 2 in remanding a sentence for mail fraud under U.S.S.G. § 2F1.1. Johnson somehow bought eighteen homes worth over $400,000 from a realty company with no money down, even though he was only making $1200 each month in salary. He never made a payment even though he collected $16,000 in rent. The lender foreclosed, and Johnson was convicted of mail fraud and equity skimming. The court of appeals agreed with the district court that the "loss" covered both the value of the real estate and the cash rents, but its entire discussion of "loss" centered on the Commentary to U.S.S.G. § 2B1.1: the real es-

tate was "taken" and the reacquisition by foreclosure was irrelevant. Id. at 1113–14. The court remanded only because it was unsure of the fair market value of the real estate *under* USSG § 2B1.1. Id. at 1114–15. The same result could easily (and more properly) have been reached under the fraud guideline by determining that Johnson intended to cause such a loss. To the extent the Tenth Circuit believes that fraud "loss" must be calculated under the theft guideline, we disagree for the reasons outlined above.

The Second Circuit has also rejected the holding advanced by the defendant here. In *United States v. Brach*, 942 F.2d 141 (2d Cir.1991), Brach fraudulently procured a loan of $250,000 from a town. Upon discovering the fraud, the town demanded the money back. Brach refused, but after the FBI came, he returned the money. The Second Circuit upheld the use of the $250,000 face value of the loan as the "loss," rather than the few days' interest the victim actually lost. The court relied on the cross-reference to U.S.S.G. § 2B1.1 and specifically declined to treat fraud cases any differently from theft cases. Id. at 143. According to the court, the "loss" was therefore the amount taken and put at risk, and Brach's claimed intent to repay the loan and the trivial ultimate harm to the victim were irrelevant. Id. (also equating "probable" loss with the amount put at risk). Although the result in *Brach* may have been correct, we respectfully decline to follow its reasoning. If the court believed that Brach intended to steal the whole $250,000 (not simply to borrow it), then the intended loss was $250,000 and the result was proper. But if Brach intended to repay the borrowed money—something the opinion declined to address—the case is more like the present one, and we disagree with the Second Circuit. In our view, Application Note 7 to U.S.S.G. § 2F1.1 straightforwardly requires the sentencing court to use actual loss in the first instance. Indeed, actual and intended loss, the two factors that the Second Circuit insisted were irrelevant, 942 F.2d at 143, are the primary proper factors in determining a "loss" under the fraud guideline.[18]

18. For the same reason, we disagree with the statement in the Second Circuit's subsequent

## C. The Post–Sentencing Amendments to U.S.S.G. § 2F1.1

The Sentencing Commission's recent (postsentencing) elucidation of proper "loss" calculation in the fraudulent loan procurement context buttresses our interpretation and that of the case law on which we rely, although we emphasize that we need not and do not rely upon the postsentencing amendments as "clarifications" of the fraud guideline in holding as we do. See also *United States v. Ofchinick,* 877 F.2d 251, 257 n. 9 (3d Cir.1989) (proposed amendment purporting to clarify sentencing guideline noted for its support, but discussion explicitly labeled as not necessary to the result). Technically, the postsentencing amendments are subsequent legislative history, always a controversial interpretative tool. See note 9. As subsequent legislative history, the amendments do not directly apply retrospectively to earlier sentencings, but they may still have limited relevance as indications of what the guidelines in effect here meant. We also feel it necessary to discuss the amendments in light of our ultimate decision to remand: those amendments not posing ex post facto problems will be in effect at resentencing.

The most recent round of guideline amendments went into effect on November 1, 1991. Of the recent amendments, two address "loss" calculation. The first responded to section 2507 of the Crime Control Act of 1990, Pub.L. 101–647, 104 Stat. 4789, 4862, reprinted in note following 28 U.S.C.A. § 994 (West Supp.1991), which instructed the Commission to promulgate or amend guidelines to require an offense level of at least 24 for defendants deriving over $1 million in "gross receipts" from crimes affecting financial institutions.[19] The Commission responded by amending several guidelines, including U.S.S.G. § 2F1.1, to increase offense levels by four levels (but at least to level 24) for defendants deriving over $1 million in gross receipts from their bank crimes. See *1991 Guidelines Manual Appendix C* at 184–85 (amendment 364). Because the new amendment's effective date postdates the defendant's crime, and it works a substantive change that could only be detrimental to the defendant, it obviously cannot apply to him, whether or not he received $1 million in "gross receipts." But the Commission's use of both "gross receipts" and "loss" in the same Commentary does suggest that the two terms do not mean the same thing (to today's Commission, at least), which renders the government's position here even more dubious. See also *United States v. Hughes,* 775 F.Supp. at 352 (same reasoning).

Even better evidence that the current Commission does not define "loss" as the amount fraudulently obtained comes from the other recent amendment to U.S.S.G. § 2F1.1 See *1991 Guidelines Manual Appendix C* at 221–24 (amendment 393). After the changes, the relevant portions of Application Note 7 to U.S.S.G. § 2F1.1 now read:

> Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). Consistent with the Provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000. There are, however, instances where ad-

decision in *United States v. Lohan,* 945 F.2d 1214 (2d Cir.1991), that "under § 2F1.1 actual loss is not the touchstone for enhancing a sentence to reflect the victims' 'loss.'" *Id.* at 1219. But in *Lohan,* at least, the court did find that Lohan "attempt[ed] to inflict" a "probable or intended loss" of the amount held as the "loss." See *id.*

**19.** "Gross receipts" is statutorily defined elsewhere to include "any property, real or person-

al, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense." See 18 U.S.C.A. § 982(a)(4) (West Supp 1991); see also new U.S.S.G. § 2F1.1 appl. note 16 ("gross receipts" means receipts to the defendant individually, rather than to all participants).

ditional factors are to be considered in determining the loss or intended loss:

. . . . .

### (b) *Fraudulent Loan Application and Contract Procurement Cases*

In fraudulent loan application cases and contract procurement cases where the defendant's capabilities are fraudulently represented, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.

In some cases, the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct. For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct. Conversely, a defendant may understate his debts to a limited degree to obtain a loan (*e.g.*, to expand a grain export business), which he genuinely expected to repay and for which he would have qualified at a higher interest rate had he made truthful disclosure, but he is unable to repay the loan because of some unfor[e]seen event (*e.g.*, an embargo imposed on grain exports) which would have caused a default in any event. In such a case the loss determined above may overstate the seriousness of the defendant's conduct.

Application Note 7 still cross-references the theft guideline Commentary, but notes that *"[f]requently*, loss in a fraud case will

be the same as in a theft case" (emphasis added). Thus the Commission implicitly recognized that occasionally the definitions will differ. Moreover, although Application Note 7 no longer discusses actual, probable, and intended loss in precisely the same way, a "loss" is generally still to be calculated as we concluded above: actual loss incurred at the time of sentencing remains the basic "loss," and intended (attempted) loss is substituted if greater.[20] More tellingly, new subheading (b) in Application Note 7 specifically addresses fraudulent loan application cases and supports our earlier analysis entirely. It plainly states that where, as here, the defendant fraudulently misstates its assets, the "loss" is the victim's actual loss—unpaid principal and interest less the amount the lender has recovered (or can expect to recover) from the loan collateral. As the revised Application Note suggests, that "loss" calculation may well over- or understate the seriousness of the offense, but the proper solution under former Application Notes 9 and 10 and current Application Note 10 is to depart upward or downward from the sentencing range.

We accordingly find nothing in the subsequent legislative history that causes us to doubt our analysis under the original guidelines themselves. Indeed, to the limited extent we consider the subsequent amendments to U.S.S.G. § 2F1.1 at all, our earlier conclusions are only confirmed.

### D. *Summary*

■ In sum, a close examination of the fraud guideline and its entire official Commentary requires the conclusion that the district court erred here by equating the "loss" with the full amount of the loan. Although the courts have split on how to define fraud "loss," we find the logic in *Schneider* and *Hughes* compelling, and we believe that the contrary case law relies on a flawed equation of fraud and theft crimes. From the recent amendments to U.S.S.G. § 2F1.1, it appears that the Sen-

**20.** We note that on resentencing (where Amendment 393 will be in effect), the district court will be spared the unenviable task of deciding what "probable loss" means. See note 16. The first paragraph of revised Application Note 7 has dropped its mention of "probable loss." Although subparagraph (b) of Application Note 7 now instructs sentencing courts to use "expected loss" in cases where the entire actual loss has not yet come about, in this case the bank has realized its entire loss (if any).

tencing Commission also agrees. We therefore confirm our tentative view above and hold that fraud "loss" is, in the first instance, the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at the time of the crime. However, the "loss" should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than actual loss.

The record in this case requires vacatur of the judgment of sentence and remand to the district court for resentencing. The district court made no findings on actual or intended loss, and the parties contest both amounts. As discussed above, the government claims that actual loss was at least $3.4 million, while the defendant claims that the bank's records cannot support an actual loss of anywhere near that amount. Also, the defendant claims he intended to repay the loan and so intended no loss, while the government (somewhat belatedly) contends that the defendant's failure to

make any payments after receiving the second loan installment belies his claim. It is the district court's province to resolve these questions, and we leave it to that court on remand to decide whether further hearings on these issues are necessary.[21] We must also remand because only the district court is authorized to determine whether the properly calculated "loss" significantly over- or understates the gravity of the crime, and therefore whether departure from the normal sentencing range is appropriate.[22]

## III. CONCLUSION

The district court erred in concluding that a "loss" under the fraud sentencing guideline, U.S.S.G. § 2F1.1, is always the amount fraudulently obtained, regardless of intended or actual loss. We will therefore vacate the judgment of sentence and remand for resentencing consistent with this opinion.

---

**21.** The defendant asserts that the government failed to preserve for appeal its contention that the defendant did not intend to repay the loan or cause loss to the bank. He notes that the government failed to object specifically to the finding in the Presentence Investigation Report that the defendant expected to repay the loan. On the other hand, the government did contest the broader issue of the correctness of the Report's overall "loss" estimate. We decline to address the waiver issue, in part because it raises questions of construction of local rules. We therefore leave it to the district court on remand.

**22.** We need not dwell on the defendant's other claims of error. First, the district court added two offense levels because it found that the defendant was the organizer and supervisor of office manager Stuart Sherer's wrongdoings; it also refused a two- or four-point credit for minor participation. We review these fact-based determinations for clear error. The defendant argues that the district court's ruling was clearly erroneous because he merely acquiesced in Sherer's misdeeds. Both David Kopp and Sherer testified, however, that the defendant took a managerial role and personally directed Sherer to commit the fraud. The district court did not clearly err by believing Sherer and David Kopp and not the defendant.

Second, the defendant challenges the two offense levels added for "more than minimal planning." He claims he was convicted of a single fraud that involved minimal planning on his part (as opposed to Sherer's). The government correctly counters that more than minimal planning is present whenever there were repeated acts over time, unless each act was opportune. U.S.S.G. § 1B1.1 appl. note 1(f). Here twenty-eight documents were delivered on three occasions, demonstrating repeated fraud and not mere taking advantage of a sudden opportunity. Again, the district court's ruling was not clearly erroneous.

Finally, the defendant contends that the district court improperly refused to consider as valid grounds for departure: (1) his own economic suffering (including bankruptcy); (2) David Kopp's alleged fraud while acting as a government agent; and (3) the guideline range's overstating the seriousness of his offense (an issue that is bound up with the earlier discussion of "loss" calculation). Because we have ruled that the guideline range used was improper, and because on remand the district court is free to revisit the issues relevant to deciding whether to depart (upward or downward) from the properly calculated sentencing range, we need not consider these claims.

SUR PETITION FOR PANEL REHEAR-
ING WITH SUGGESTION FOR RE-
HEARING IN BANC

Feb. 18, 1992.

PRESENT: SLOVITER, Chief Judge,
BECKER, STAPLETON, MANSMANN,
GREENBERG, HUTCHINSON, SCIRICA,
COWEN, NYGAARD, ALITO, ROTH,
Circuit Judges and FULLAM, District
Judge *.

The petition for rehearing filed by Appel-
lant, having been submitted to the judges
who participated in the decision of this
Court and to all the other available circuit
judges in active service, and no judge who
concurred in the decision having asked for
rehearing, and a majority of the circuit
judges of the circuit in regular active ser-
vice not having voted for rehearing by the
court in banc, the petition for rehearing is
DENIED.

* As to panel rehearing only.