974 F.2d 1332
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Sheppard C. BELL, Jr., Defendant-Appellant.
 No. 91-5408.
 United States Court of Appeals,
Fourth Circuit.
 Submitted: June 24, 1992
Decided: August 28, 1992
 
 James O. Broccoletti, Zoby & Broccoletti, P.C., Norfolk, Virginia; Wyatt B. Durrette, Jr., Durrette, Irvin, Lemons & Fenderson, Richmond, Virginia, for Appellant.
 Richard Cullen, United States Attorney, Alan M. Salsbury, Assistant United States Attorney, Norfolk, Virginia, for Appellee.
 Before HALL, PHILLIPS, and SPROUSE, Circuit Judges.
 PER CURIAM:
 
 
 1
 Sheppard Bell, Jr., pled guilty to one count of bank fraud (18 U.S.C. § 1344 (Supp. II 1990)). He appeals the sentence he received, and we affirm.
 
 
 2
 Bell was the owner and president of Bell Motors, Inc., and also owned Bell and Company, which bought and sold peanuts. John Wheeler was the general manager of Bell Motors, responsible for the day to day operation of the business. Bell Motors purchased new cars on a line of credit from Sovran Bank. Its agreement with Sovran required that, within five days of the sale of a car to a customer, Bell Motors would remit an amount equal to the original cost of the car to Sovran. Between February 1988 and April 1990, Bell Motors failed to remit the money owed to Sovran on the sales of seventy-five cars, a total of $1,042,001.55. When the fraud was uncovered, Bell fired Wheeler. Sovran agreed to lend Bell $145,192.98 to permit liquidation of the company's assets. The sale of remaining inventory resulted in a further deficiency of $64,620.20, making an overall debt of $1,251,814.73. Bell and his son, who was an officer of Bell Motors, pledged all of their real estate toward repayment of this debt.
 
 
 3
 Shortly afterward, Bell pled guilty to bank fraud under a plea agreement which shielded his son from prosecution. Bell and the government also agreed that, for sentencing purposes, the amount of loss was $100,000. During Bell's plea hearing, he was repeatedly warned by the district court that the court was not bound by the parties' agreement on this figure, and that Bell's sentence would reflect the loss to the bank as determined by the court. Bell elected to enter his guilty plea.
 
 
 4
 The probation officer calculated Bell's offense level using $1,251,814.73 as the amount of the bank's loss. This figure produced an eleven-level increase from the base offense level. See United States Sentencing Commission, Guidelines Manual, § 2F1.1(a)(1)(L) (Nov. 1990) (loss of $800,000 to $1,500,000). Both Bell and the government objected to the offense level calculation.
 
 
 5
 At the sentencing hearing, the district court heard testimony from the accountant who prepared tax returns for Bell Motors and for Bell personally for ten years, from an investigator hired by Bell after he fired Wheeler, from the case agent, and from the probation officer. There was evidence from the accountant that Bell was aware "early on" that the company was not always forwarding the money owed to Sovran Bank when a car was sold, and that the true amount owed to Sovran was reflected on the company's books at the end of each year. Bell's investigator attempted to present a picture of the scheme which put most of the blame on Wheeler by reconstructing his activities from the company's financial records, which the accountant had said were complicated and difficult to penetrate.
 
 
 6
 The case agent testified that interviews of Bell Motors employees had disclosed that Bell was kept apprised of the financial state of the company through financial reports which he received on a daily or weekly basis, and that he had knowingly signed false financial statements which were submitted to Chrysler Corporation and to Sovran Bank. Information in the presentence report from FBI interviews with the company's bookkeepers revealed that Bell had directed the preparation of false financial statements.
 
 
 7
 Both Bell and the government maintained that, although Bell admitted knowing about the fraud, he could not foresee a loss to the bank of more than $100,000. In support of this view, the government relied on the opinion of a Sovran Bank official that Bell had been unaware of the scale of the fraud, and on the fact that Bell had passed the polygraph test administered by his investigator.
 
 
 8
 Bell argued that the extent of the fraud was not reasonably foreseeable to him because he was not well enough informed about the operation of the company and Wheeler's activities. He also argued that the amount of loss should be reduced by the money Sovran expected to recover from the sale of his real estate; the bank anticipated that its ultimate actual loss would be about $392,000. Finally, Bell moved for a downward departure on the ground that the amount of loss overstated the seriousness of the offense.
 
 
 9
 The district court found that the intended loss was $1,251,814.73, the loss which was suffered before the fraud was discovered and Bell began to make restitution. It found that Bell was sufficiently informed about the ongoing state of the business and participated in the fraud to a sufficient degree that the full amount was foreseeable to him. It found no mitigating factors to justify a downward departure. Bell received a sentence of twenty-four months, the lowest point of the guideline range.
 
 
 10
 Bell first contends on appeal that the district court erred in finding that he intended any loss to the bank because he always believed the amount by which the company was "out of trust" was small enough to be covered by sale of his personal assets if necessary. He also maintains that he believed the personal loans he made to Bell Motors over its lifetime brought it current in its payments to Sovran each time. We find no evidence in the record to support the latter contention.
 
 
 11
 Whether a defendant who obtains a loan fraudulently intended a loss to the lender is a factual question reviewed under the clearly erroneous standard. United States v. Rothberg, 954 F.2d 217 (4th Cir. 1992). If a probable or intended loss can be determined and it is greater than the victim's actual loss, it should be used to determine the sentence. United States Sentencing Commission, Guidelines Manual, § 2F1.1, comment. (n.7) (Nov. 1990).
 
 
 12
 Because Bell was admittedly acting in concert with Wheeler, he was accountable for actions by Wheeler in furtherance of the fraud which were reasonably foreseeable to him. U.S.S.G.s 1B1.3(1)(a), comment. (n.1). Foreseeability is also a factual question. United States v. Vinson, 886 F.2d 740 (4th Cir. 1989) (amount of drugs foreseeable to defendant in drug conspiracy), cert. denied, 493 U.S. 1062 (1990).
 
 
 13
 The district court's finding, by a preponderance of the evidence, that Bell intended a loss to the bank and that the loss he was attempting to inflict was over $1 million is not clearly erroneous. Bell was kept sufficiently informed about the financial condition of his company that he could reasonably foresee a loss to the bank on the scale that occurred. As stated in the district court's order, Bell acknowledged his participation in the fraud, he received daily or weekly reports on the financial health of the company, he had prepared and he signed false financial statements, and there was evidence from his accountant that the actual amount owing to Sovran Bank was shown each year when the company's taxes were done. There was no evidence that Bell made any move to substantially change the company's mode of doing business until the fraud became known. It is less clear that the $145,192 loan should be considered an intended loss since the bank made this loan after the fraud was revealed and secured it with Bell's real estate holdings, which he immediately began selling to effect repayment. However, excluding this amount would not bring the loss below $800,000, and thus would not change Bell's offense level.
 
 
 14
 Bell next argues that $392,864 should be used to calculate his sentence because it will be the bank's actual loss after all his assets are sold and it is greater than the loss he intended, which was zero to $100,000. When a loan has been obtained through fraud, the victim's actual loss is used to compute the sentence only if the defendant did not intend to inflict a greater loss, in which case the intended loss is used. When actual loss is used, it is the amount of the loan less the amount recovered from collateral pledged to secure the loan. See Rothberg, 954 F.2d at 219 (noting that November 1991 amendment to § 2F1.1, comment. (n.7) so instructs the court); United States v. Kopp, 951 F.2d 521 (3d Cir. 1991).
 
 
 15
 In Bell's case, however, even if we were to find that the district court clearly erred in finding that Bell intended a loss to the bank, or in finding that he intended a loss of over $100,000, the amount used by the probation officer to compute Bell's offense level already took into account what Sovran Bank had been able to recover from collateral pledged to secure the line of credit. What additional amounts it might recover from Bell's other assets, which he pledged only after the fraud was discovered and prosecution loomed, is"akin to restitution and is not a proper consideration in determining the loss suffered as a result of the fraud." Rothberg, 954 F.2d at 219. Therefore, under either view, the bank's loss would be in the $800,000 to $1,500,000 range, and no change in the offense level would result.
 
 
 16
 Last, Bell contends that the district court violated Fed. R. Crim. P. 32 by failing to rule on his motion for a downward departure and thus left unresolved a controverted matter. Although the court did not rule orally on the motion, its written order found that the amount of loss did not overstate the seriousness of the offense and declined to depart downward. To the extent the motion raised a controverted matter, the district court's order resolved it.
 
 
 17
 We therefore affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 AFFIRMED