UNITED STATES of America,
Plaintiff–Appellee,

v.

Kent HARPER, Defendant–Appellant.

No. 93–10495.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 1994.

Decided Aug. 15, 1994.

**1388**

David Lee Titterington, Deputy Federal Public Defender, Phoenix, AZ, for defendant-appellant.

Peter S. Sexton, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: FERNANDEZ, RYMER, and T.G. NELSON, Circuit Judges.

FERNANDEZ, Circuit Judge:

Kent Harper was convicted of mail fraud, equity skimming and conspiracy to commit mail fraud and equity skimming. *See* 18 U.S.C. §§ 371 and 1341; 12 U.S.C. § 1709–2; 18 U.S.C. § 2. He claims that the district court erred in determining the amount of his victims' losses when it calculated his Guideline score. Thus, he appeals from his sentence.[1] Because we agree with his contention, we vacate his sentence and remand for resentencing.

## BACKGROUND

Harper and his co-conspirator, Larry Spotswood, formed K & L Investments for the purpose of conducting a mail fraud and equity skimming enterprise. They mailed letters to homeowners who were behind on their mortgage payments and whose loans were federally insured. The homeowners were tricked into believing that if they sold their homes to K & L they would no longer be obligated on the mortgages, and their credit histories would not show that they had been foreclosed upon. This proposition was attractive to the homeowners because their equity in the properties was nothing or negative at that time. That is to say, the unencumbered fair market value of the property did not exceed the amount of the encumbrances.

Though the proposition was attractive, it was too good to be true. In fact, K & L did not assume the mortgages and had no intention of doing so. The homeowners remained bound to the terms of the mortgages and to all responsibilities that they had to the lenders before the sales were made to K & L. Harper's true intention was to gain possession of the properties, rent them out, keep the rents, and let the lenders foreclose. Of course, he had no intention of making payments on the mortgages and, basically, did not make any. Over a period of fifteen months K & L acquired some 150 to 300 homes. All of them were eventually foreclosed upon.

A phase of the scheme—the moneymaking part—required renting the properties during the period between the time K & L gained control and before it lost control. In order to do that, K & L offered good deals to renters and pretended that the renters could stay in the homes for an extended period. The renters did pay their rent, but they were put out of the properties as soon as the lenders could foreclose and take over. Having been assured of long-term occupancy, some of the renters actually made improvements to the homes. Of course, in general, the renters did receive some value for their money—a roof over their heads at a very reasonable price. According to the books and records of K & L, which probably understated the income, over $160,000 in rent was collected during the progress of the scheme.

The district court determined that the loss to the victims from the scheme was the average fair market value of the unencumbered properties plus the total amount of the rent collected by K & L. As a result, the court multiplied the lowest number of homes (150) by their average fair market value ($40,000) for a total of $6,000,000. It then added the estimated rent collections ($160,000) and reached a grand total of $6,160,000. Using that number, the court applied United States Sentencing Commission, *Guidelines Manual*, § 2F1.1(b)(1)[2] and increased Harper's of-

---

1. He also challenges his conviction on several grounds. We have addressed those challenges in an unpublished memorandum disposition filed this date.

2. All references are to the Sentencing Guidelines effective November 1, 1992, unless otherwise indicated.

fense level by 14 points. It is from that calculation that Harper appeals.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

■ We review the district court's interpretation of the Sentencing Guidelines *de novo*. *United States v. Hayes*, 7 F.3d 144, 145 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1403, 128 L.Ed.2d 76 (1994). We review the district court's factual findings for clear error. *United States v. Chapnick*, 963 F.2d 224, 226 (9th Cir.1992).

## DISCUSSION

The parties do not dispute the applicability of U.S.S.G. § 2F1.1 to Harper's offenses. That guideline sets a base offense level of 6—§ 2F1.1(a)—and provides for an increase in the level "[i]f the loss exceeded $2,000...." § 2F1.1(b)(1). The table which is a part of § 2F1.1(b) increases the number of points as the amount of the loss increases.

■ The question, then, is how much was the "loss," and that is not always easy to say. It is not easy here, although the Guidelines do give us some guidance. But before turning to those provisions, we must dispose of Harper's threshold suggestion that the homeowners could not have lost anything because the fact that their homes were in foreclosure, or about to be in foreclosure, meant that they had nothing to lose. We disagree. The homeowners did continue to have an interest in their properties, even if that interest did not have a cash value at that time. Indeed, Harper knew that. That is why he resorted to fraud in order to obtain what the homeowners did have. As Harper well knew, the homeowners would not have sold to him if he had not represented to them that they were getting something for their interests—that is, relief from the obligation of the mortgages and cleaner credit reports. They were, in a word, "owners," and they were not willing to relinquish that ownership to just anyone on just any terms. Thus,

even if Harper paid the homeowners what their property was worth to them in terms of dollars—perhaps nothing—they were not willing to sell on those terms alone. "The strictures an owner puts on his willingness to sell an item are not mere ephemera. When a prospective buyer lies in order to evade those strictures, a fraud has been committed upon the owner of the item...." *United States v. Bruchhausen*, 977 F.2d 464, 469 (9th Cir. 1992) (Fernandez, J., concurring; Kozinski, J., joining). Thus, Harper's approach will not work at quite so simple a level, but that does not mean that he has failed to touch a nerve when he argues that there was no monetary loss whatever. With that observation, we return to the Guidelines.

The United States Sentencing Commission recognizes that the concept of "loss" is not self-defining. In its discussion of fraud cases, it says:

> Valuation of loss is discussed in the Commentary to § 2B1.1.... As in theft cases, loss is the value of the money, property, or services unlawfully taken.... Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

U.S.S.G. § 2F1.1, comment. (n. 7). In fraud cases, too, there may be further impediments to determining the victim's loss, and for that reason:

> [T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

U.S.S.G. § 2F1.1, comment. (n. 8).

■ Still, there is a need to attempt to value what was taken from the victim be-

cause "[t]he value of [the] property taken plays an important role ... for theft offenses, because it is an indicator of both the harm to the victim and the gain to the defendant." U.S.S.G. § 2B1.1, comment. (backg'd). That method of valuation is described in U.S.S.G. § 2B1.1, comment. (n. 2), which reads:

> "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed.

This approach works rather well in cases of theft and outright destruction of property. It is an excellent indicator of the harm to the victim and of the gain to the offender. Similarly, if the victim is relieved of cash, it is often easy to see that the amount of cash is the value of what was taken, whether it was taken by theft, destruction or fraud. *See United States v. Wilson*, 993 F.2d 214, 217 (11th Cir.1993).

The Guideline definition usually does work well in the case of theft, even if the stolen property is encumbered. One would be loathe to say that the fair market value of moveable goods had changed because an encumbrance of one type or another was upon the property. In a theft, the unwilling owner is relieved of the property and the thief is enriched by its value. One can readily assess the seriousness of the defendant's conduct in that instance by looking to the fair market value of what was stolen. In the area of fraud, also, "[t]he Guidelines are concerned with assessing the seriousness of the defendant's conduct, given the wide array of conduct covered by fraud." *United States v. Haggert*, 980 F.2d 8, 13 (1st Cir.1992). Thus, as the court said in *Haggert*, there can be a vast difference between a person who obtains a contract by fraud with no intention of performing it and one who obtains a contract by fraud but who does intend to perform.

*Id.* at 12–13. But does that mean that someone, like Harper, who acquires an overencumbered property by fraud with no intention of making good on his promises, should be treated exactly like a thief who has stolen the property? The district court, following *United States v. Johnson*, 941 F.2d 1102 (10th Cir.1991), said "Yes." In *Johnson*, the defendant purchased properties which were mortgaged and he assumed the loans. He paid no money down and never made a mortgage payment. However, he did collect the rents. Foreclosure followed, and Johnson was prosecuted for mail fraud and equity skimming. *Id.* at 1104–05. With respect to sentencing, the court said:

> We believe the real estate was "taken" within the meaning of the term "loss" as it is used in the Guidelines. The Government's reacquisition of the real estate through foreclosure does not change the fact that the Defendant took the real estate in the first place.... The fact the Government was able to reacquire the properties does not diminish Defendant's culpability and responsibility for the fraudulent scheme he masterminded. We hold the district court committed no error in construing the term loss. The district court permissibly decided to base Defendant's sentence on the value of all the property taken, including the value of the real estate and cash.
>
> ....
>
> ... On remand the district court should make factual findings that will reveal the fair market value of the real estate. The court may then properly set Defendant's offense level by combining the real estate's fair market value with the cash amount the Government lost to determine the Government's total loss.

*Id.* at 1114–15 (citations omitted). Thus, it appears beyond cavil that the court did use the full fair market value of the property plus any other losses the government may have sustained. In so doing, it appears to have held that when Johnson acquired the property from its true owner by fraud, the government itself lost the property and then reacquired it by foreclosure. It is rather difficult to see how a lender, or the insurer of

a lender, can be said to have lost a piece of real property when the owner legally transfers it to someone else. It seems more accurate to say that the owner has lost the property itself through fraud and that the lender, perhaps, has become less secure because it does not have an honest person to look to for repayment of the loan. At any rate, whether the court thought of the government or the owner as the loser, it appears to have been concerned with actual, not intended, loss.

■ Here, too, intended loss is not the question. There is no evidence that Harper intended to inflict a greater loss upon his victims than that which has occurred. In fact, he could not have done so. All he could do was make use of, and perhaps waste, the property until the foreclosure took place. But as the Tenth Circuit has since ruled, actual loss is a measure of what the victims of the fraud were actually relieved of. *See United States v. Haddock,* 12 F.3d 950, 961 (10th Cir.1993). In that case, the defendant obtained fraudulent loans but gave some security for them. As a result, the loss to the victims was not the full amount of the loans. The court said:

> Actual loss under section 2F1.1 is "the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost." A court should measure actual loss by "how much better off the victim would be but for the defendant's fraud." This measure properly includes all types of losses but does not include those that are not attributable to the defendant's fraud. Furthermore, only net loss is considered; anything received from the defendant in return reduces the actual loss.
>
> ....
>
> ... Although fraudulently obtained, the loans could cause no actual loss if they were fully secured.

*Id.* at 961 (citations omitted). In reaching this conclusion, the court relied upon *United States v. Kopp,* 951 F.2d 521 (3d Cir.1991). In *Kopp,* the defendant obtained a fraudulent loan but gave property as collateral for the loan. The government pointed to the theft guideline definition of loss as the value of what was taken and noted that the full amount of the loan was taken. The court saw that approach as overly simplistic. As it said, "all thefts involve an intent to deprive the victim of the value of the property taken," but that is not necessarily true of frauds. *Id.* at 529. The court went on to say:

> Mechanical application of the theft guideline in fraud cases would frustrate the legislative purpose of the guidelines and contravene the specific language of the Commission. The sentencing guideline system was designed to sentence similarly situated defendants similarly; basing all fraud sentences on a simple "amount taken" rule without regard to actual or intended harm would contravene that purpose. We think it plain that actual harm is generally relevant to the proper sentence.

*Id.* After a tour de force among the Guidelines and the cases, the court concluded that fraud loss was "primarily ... the amount of money the victim has actually ended up losing at the time of sentencing...." *Id.* at 531. The court was construing an earlier iteration of the Guidelines, but, as it said, the current Guidelines even more clearly bear out its interpretation. The court also distinguished and questioned *Johnson*'s reasoning in part. *Id.* at 533. Again, in *Haddock,* 12 F.3d at 961, the Tenth Circuit appears to have accepted the *Kopp* approach. *See also United States v. Baum,* 974 F.2d 496, 499 (4th Cir.1992); *cf. First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 768 (2d Cir. June 9, 1994) (where loan fraudulently induced, lender still has no fraud damage until it has foreclosed).

Of course, *Kopp, Haddock,* and *Baum* were concerned with loans obtained by fraud, whereas *Johnson* and the case at hand involved the obtaining of a piece of encumbered property by fraud. We must decide whether this kind of case is one of those "frequent" instances where the loss should be treated just like a theft loss would be, or whether it is more like the fraudulent loan application cases. *See* U.S.S.G. § 2F1.1, comment. (n. 7).

It would seem easier to treat the loss in the same way that a theft loss would be treated. Indeed, it can be said that Harper had to acquire the property from the owner

in order to use it for his own purposes, just as a thief would have had to have stolen the property. Here, instead of stealing the property, Harper obtained it by fraud. Of course, his use was foreshortened once the lender *did* foreclose, but so too is a thief's use foreshortened if the owner, or someone else, recaptures the stolen property. Thus, one would only need to calculate the fair market value of the property taken and, perhaps, consider other losses that naturally flowed from the wrongdoing. As we have said, this is a simple approach, but we think it is unacceptable.

■ The straight theft argument does not properly examine the actual facts. Nor does it examine the wrongdoing, both intended and actual. It assumes a loss to the victim that is not realistic. Harper did not set out to take the fair market value of the homes away from the victims, nor did he do so. The owner-victims knew that the cash value of what they had, at least as far as they were concerned, was little or nothing. No one tricked them in that regard. It is not reasonable to act as if they were deprived of an asset of great value. Moreover, it is rather artificial so to do. That would make the loss vary from owner-victim to owner-victim based upon nothing more than the appraised value of the property, even though the amount that the owner lost may have no relationship whatever to that value. For that reason, we reject the rationale of *Johnson* and vacate the sentence in this case.

Similarly, the renter-victims cannot be said to have lost all of the rental money they paid. Indeed, if they obtained commensurate value for their payments, they suffered no loss at all.

■ Of course, that leaves us with the question of how the loss inflicted upon the victims, if any there was, is to be valued. It seems pellucid that the rents Harper received represent a value that he took from the owner-victims. It is, by the way, the very value (perhaps among others) that he intended to take from them. Thus, the use of that figure has the virtue of representing actual loss, intended loss and even the offender's gain. *See* U.S.S.G. § 2F1.1, com-

ment. (nn. 7–8). That loss appears to be $160,000.

If the renter-victims did not receive commensurate value because they paid for something they did not get, or, for example, because they were induced to make improvements to the property itself, that would constitute a loss to them. Perhaps they did pay some premium because they expected to live on the property for a long time. Of course, to the extent that what they lost is reflected in the rent figure used to determine the loss to the owners, there should be no double counting.

If the United States or the lenders suffered a loss because of Harper's actions, that is not apparent on this record. As we have already intimated, their loss is not the fair market value of the property. Presumably they captured the fair market value when they foreclosed. By the same token, it is not simply the deficiency arising at the sale. We see nothing in the record to indicate that the whole of the deficiency was due to Harper's actions. Rather, it is clear that the loans were in trouble long before Harper stepped in. If it can be shown that a portion or all of the deficiency was brought about by Harper's actions, that loss could be considered a part of the actual loss inflicted by him.

■ We do not intend to exhaustively list all of the possible losses that an equity skimmer, like Harper, can inflict upon his victims. What we do insist upon, however, is use of a realistic, economic approach to determining what losses he truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss. By dealing with the loss calculation in this manner, we remain faithful to the Guidelines' admonition that courts are to attempt to determine "value."

We recognize that there may be times when the concept of value does not "fully capture the harmfulness and seriousness of the conduct" so that "an upward departure may be warranted." U.S.S.G. § 2F1.1, comment. (n. 10). Perhaps this is one of those

times, but we do not undertake to decide that issue.[3]

## CONCLUSION

■ There is nothing commendable about Harper's actions. He perpetrated a simple, yet complex, fraud that had many victims—the owners, the renters, the lenders, and the government itself. Nevertheless, for purposes of U.S.S.G. § 2F1.1, the question must be: What is the value of the harm caused to Harper's victims? The district court decided that it was the full fair market value of the property. We do not agree. That does not provide a realistic measure of what Harper took or of what he intended to take or of what he gained. The proper measure is the actual economic value of that which Harper obtained from his various victims. On the record before us that would include the rents he received, any amounts renters were induced to pay or expend which are not reflected in the rents, monetary losses inflicted upon the lenders and the government, and any other economic loss that can be proved. We must therefore vacate Harper's sentence and remand for a determination of those amounts. If the value so obtained does not "fully capture the harmfulness and seriousness of [Harper's] conduct, an upward departure may be warranted." U.S.S.G. § 2F1.1, comment. (n. 10). We leave that to the determination of the district court.

SENTENCE VACATED; REMANDED FOR RESENTENCING.

3. We cannot, however, refrain from noticing that the homeowners did fail to obtain what Harper promised them when they transferred their homes to him. Though his false promises alone are not a "loss" he did tell them that they would no longer have liability on their loans and that their credit would not be affected. If their credit was affected or if they did have to face deficiency judgments, Harper seriously hurt their expectations, even if he did not inflict an economic loss upon them. We leave it to the district court to decide whether these and other harms caused by Harper's facinorous conduct are serious enough to warrant a departure.