UNITED STATES of America,
Plaintiff–Appellee,

v.

Otis C. RILEY, aka Brandon Allen
Becker, III, Defendant–
Appellant.

No. 97–30114.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1998.

Decided May 13, 1998.

Thomas W. Hillier, II, Federal Public Defender, and Carol Koller, Asst. Federal Public Defender, Seattle, WA, for defendant-appellant.

Kenneth Parker, Asst. U.S. Atty., Seattle, WA, for plaintiff-appellee.

Appeal from the United States District Court for the Western District of Washington; John C. Coughenour, District Judge, Presiding.

Before: HUG, JR., Chief Circuit Judge, REINHARDT, Circuit Judge, and REED, Senior District Judge.*

REINHARDT, Circuit Judge:

We consider in this case two issues related to Otis Riley's conviction for the offense of conspiracy to commit tax fraud. The first is whether the district court properly based Riley's offense level on the amount of the intended loss, rather than the amount of the actual loss. The second is whether the district court properly ordered restitution for losses not directly related to the criminal scheme with which he was charged and convicted. We conclude that the district court's determination of the offense level, which was based on the amount of intended loss, was proper. We agree with Riley, however, that the district court was without authority to order restitution for losses only tangentially related to the criminal scheme.

---

Background

Between 1993 and 1995, Otis Riley participated in a scheme to file fraudulent tax returns. Using various names (including his own), he opened several post office boxes throughout the state of Washington and elsewhere, and used these addresses on tax returns that he filed. The false returns contained fraudulent names and wage information. In all, 206 claims for refunds were filed, totaling over $249,000 in claimed tax refunds. With the assistance of a friend who worked as a teller for Seafirst Bank in Seattle, Washington, Riley and other coconspirators managed to cash 19 checks that had been issued by the U.S. Treasury (some of which had been altered), resulting in an actual loss of $71,804. All of the checks were cashed by the same friendly teller at Seafirst over the course of a few weeks, from mid-May to early June 1995.

Sometime in early June, after he had negotiated several checks at the bank, Riley bought a brand new Corvette at a price of about $85,000. Using money he had obtained from cashing the IRS checks, he made a $20,000 down payment on the car and obtained the balance of the purchase price through a loan from Seafirst. Riley's car loan application apparently contained false information, but he did not enlist the assistance of the friendly teller in securing the loan. The car itself provided all the security the bank requested.

In March 1996, Riley was arrested for tax fraud and, pending resolution of the case, was released to a halfway house on the condition that he surrender the Corvette and its keys. He failed to comply with the condition and instead promptly absconded. An indictment for failure to appear was issued against him and when he was eventually located in San Jose, California, the car was nowhere to be found.

Upon his rearrest, Riley pleaded guilty to the failure to appear charge. Following negotiations with the government, he also pleaded to charges of conspiracy to commit tax fraud. In his plea agreement on the

---

* The Honorable Edward C. Reed, Senior United States District Judge for the District of Nevada, sitting by designation.

conspiracy charge, Riley admitted to filing the false returns and cashing the IRS checks at Seafirst. He was not accused of and did not admit to any conduct relating to the obtaining of the car loan. Riley was sentenced for both the conspiracy to commit tax fraud and the failure to appear offenses. The district court imposed a sentence of 46 months imprisonment, to be followed by a three-year term of supervised release. The court also ordered Riley to pay $129,221.04 in restitution, which included the amount outstanding on the car loan.

In calculating the appropriate offense level under the sentencing guidelines, the district court determined that the amount of loss from the scheme was the intended loss of $249,605, the face amount of the tax refund claims that were filed. The district court rejected Riley's argument that the sentence should not be based on the intended loss, but instead on the actual loss of $71,804, and that alternatively the loss should be determined under some form of economic reality test. The district court also rejected Riley's contention that because the car loan was not part of the offense to which he pleaded guilty and was not relevant conduct for purposes of sentencing, it was inappropriate to order restitution of the loan proceeds.

Riley appeals, arguing that the district court erred in rejecting both of these arguments.

## I. Actual or Intended Loss

■ Riley's first contention on appeal relates to the district court's determination that his sentence should be based on the intended loss from the scheme, and not the actual loss. Under § 2F1.1 of the sentencing guidelines, the offense level for a tax fraud conviction is determined in large part by assessing the amount lost—the higher the

loss, the higher the offense level. Application note 7 provides that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, application note 7.

In United States v. Lorenzo, 995 F.2d 1448, 1460 (9th Cir.1993), we specifically rejected the argument that in the context of a tax fraud scheme, " 'loss' under section 2F1.1 means only actual loss." Instead, we held in Lorenzo that the sentencing court should use the amount of the intended loss (where higher) in determining the proper sentence. We reaffirmed this position in United States v. Robinson, 94 F.3d 1325, 1328 (9th Cir.1996).

Nevertheless, Riley contends that some of our recent decisions have signaled a shift in fraud cases to the so-called "economic reality approach," under which a court bases its sentence in part on the amount of actual loss. In support of this contention, Riley cites to United States v. Harper, 32 F.3d 1387 (9th Cir.1994). As Harper and other similar cases make clear, however, the economic reality approach is simply one means of arriving at a fair measure of the actual or intended loss. The approach is particularly useful in certain types of fraud cases in which the value of the property obtained, or sought to be obtained, by means of the fraud bears little or no relation to the amount of loss the defendant actually inflicted or intended to inflict.[1] See, e.g., United States v. Allison, 86 F.3d 940, 944 (9th Cir.1996) (calculating the loss from credit card fraud by subtracting payments the defendant made to the credit card accounts). In those fraud cases, the intended losses cannot be calculated as in theft cases, that is, by simply looking at the value of the object of the fraud. Instead, the intended loss calculation requires a more sophisticated examination of other factors, in-

---

1. In Harper, the defendant convinced homeowners who were behind in their mortgage payments that if they sold their homes to him, they would no longer be obligated under their mortgages and their credit histories would therefore not reflect the fact that they had been foreclosed upon. Harper never assumed the mortgages and never made any mortgage payments. Instead, he rented the houses out for a period of time, collected a substantial amount of rent, and eventually allowed the lenders to foreclose upon the properties. Harper, 32 F.3d at 1388.

Although the district court calculated the intended loss as the amount of rent Harper received for the properties plus the average fair market value of the homes, we reversed, concluding that the fair market value was not an accurate indication of the amount of loss Harper intended to inflict or the amount he actually inflicted. The victims had not been defrauded out of houses worth their fair market value, but had instead been defrauded out of houses that were heavily encumbered by debt and were about to be foreclosed upon. Id. at 1392–93.

cluding the amount of actual loss. In any event, the objective under the economic reality approach is to arrive at a fair assessment of the loss the defendant actually inflicted or intended to inflict, as contemplated by the guidelines.

In this case, it is clear that the amount set forth on the face of the claims for refund is the precise amount of loss Riley intended to inflict. All that is required is a simple mathematical calculation, and there is no reason to use any more sophisticated method of determining the loss. Accordingly, we conclude that the district court did not err in calculating the amount of the intended loss or Riley's base offense level.

## II. Restitution

■ Riley's second claim of error is more meritorious. It requires us to determine whether the district court correctly ordered him to pay restitution for the amount outstanding on his car loan. The district court's authority to order restitution is created, and therefore limited, by statute. The provisions applicable to Riley's conduct are contained in the Victim and Witness Protection Act ("VWPA").[2] *See* 18 U.S.C. § 3663(a)(1), (2). Under the VWPA, a district court may order a defendant convicted of an offense under Title 18 of the United States Code to "make restitution to any victim of such offense." *Id.* at § 3663(a)(1). As amended in 1990, the VWPA provides that in cases involving "a scheme, a conspiracy, or a pattern of criminal activity," a "victim" of the offense includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* at § 3363(a)(2).

In *United States v. Reed,* 80 F.3d 1419, 1420 (9th Cir.1996), we held that under the statute, a district court may not impose restitution for conduct that was not an element of the offense for which the defendant was convicted. We noted, however, that the 1990 amendment created an exception to this rule:

> a restitution order may cover conduct that is not an element of the offense provided that 1) a scheme, conspiracy or pattern of

criminal activity is an element of the offense and 2) the conduct in question was part of that scheme, conspiracy or pattern of criminal activity.

*Id.* at 1420 n. 1. There is no question that Riley was convicted of an offense—conspiracy to commit tax fraud—that contained as an element "a scheme, conspiracy or pattern of criminal activity." The issue is, thus, whether the car loan constituted conduct that was "part of that scheme, conspiracy or pattern of criminal activity." We think it is clear that it did not.

■ In considering what conduct constitutes part of a criminal scheme or conspiracy, we follow the Third Circuit's reasoning in *United States v. Kones,* 77 F.3d 66 (3d Cir. 1996). The part of the decision that is particularly relevant here is the court's holding that "the harm to the victim [must] be closely related to the scheme, rather than tangentially linked." *Id.* at 70. We agree with that holding and analyze the car loan in that light.

Here, Riley pleaded guilty to conspiracy to commit tax fraud. His plea agreement sets forth a scheme by which he and his coconspirators submitted fraudulent tax forms, collected refund checks from the IRS, and negotiated the checks at Seafirst Bank. Although Riley used proceeds from the scheme as the down payment on the car and those proceeds were thus useful to him in his effort to obtain a loan for the balance from Seafirst, the loan was simply not part of the scheme. While we assume that Riley obtained the loan by making false representations, none of Riley's co-conspirators participated in the loan application process and the loan did not serve to further the objectives of the conspiracy. Beyond the fact that money from the scheme was used in connection with the loan, there is nothing tying the loan to the tax fraud scheme. That Seafirst was the same bank that processed Riley's car loan, and that the fraudulent tax scheme and the false representations regarding the loan occurred during the same period of time establishes at most a tenuous relationship between the loan and the scheme. The car loan was in actuality only "tangentially linked" to the tax fraud

---

**2.** The statute has recently been amended, but the provisions relevant to our discussion remain un-

changed.

scheme. Absent a close connection between the two, the district court was without authority to order restitution of the loan proceeds.

### Conclusion

Riley's first claim of error, that in determining his base offense level under the sentencing guidelines, the district court should have considered the amount of actual loss rather than the amount of intended loss, or should have applied an economic reality test instead of making a simple mathematical calculation, is without merit. With respect to his second claim of error, we agree with Riley that the district court improperly ordered him to make restitution for the car loan. The loss that the bank suffered as a consequence of the loan was not directly related to the criminal scheme with which Riley was charged and convicted, and the district court therefore lacked the statutory authority to order restitution of the loan proceeds.

Accordingly, we affirm the sentence imposed, but vacate the order of restitution and remand so that the district court may assess the proper amount of restitution in light of this opinion.

**AFFIRMED in part; VACATED and REMANDED in part.**