

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-14-2007

# USA v. Blood

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2164

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Blood" (2007). *2007 Decisions.* Paper 594.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/594

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2164
_____

UNITED STATES OF AMERICA

v.

GEORGE BLOOD,

Appellant.

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 04-cr-00061-1)
District Judge: Honorable Kent A. Jordan
_____

Submitted Under Third Circuit LAR 34.1(a)
on July 9, 2007

Before: RENDELL and AMBRO, Circuit Judges,
and SHAPIRO,* District Judge.

(Filed August 14, 2007)

_____

OPINION OF THE COURT
_____

_____

 * Honorable Norma L. Shapiro, Senior Judge of the United States District Court for
the Eastern District of Pennsylvania, sitting by designation.

RENDELL, Circuit Judge.

George Blood appeals from both the conviction and sentence entered against him by the United States District Court for the District of Delaware. Blood was convicted on six counts of wire fraud, three counts of mail fraud, and three counts of illegal monetary transactions and sentenced to 78 months' imprisonment, three years of supervised release, a $1,200 special assessment, and restitution of $270,400. With respect to his conviction, Blood argues that the District Court erred by failing to instruct the jury that he must be found to have "culpably participated" in the criminal scheme for which he was indicted and, additionally, that there was insufficient evidence to establish that he knowingly participated in the fraudulent scheme. With respect to his sentence, Blood argues that the District Court erred when it found a loss amount of over $1,000,000, and that it violated his Sixth Amendment rights by imposing guideline enhancements based on facts not proven to a jury beyond a reasonable doubt. We have jurisdiction over this appeal. *See* 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We will affirm both Blood's conviction and his sentence.

**I.**

This story begins sometime in 1999 when Blood and his friend and business partner, Vanden Eynden, were introduced to Jane Wong and Yoichi Moruichi, the owners of Global Source International, LLC ("Global Source"), that claimed to have had success investing in "high-yield" investment programs. Around the same time, Blood and Eynden met Carol McCarthy, who was similarly interested in investing in the high-yield

2

investment programs pitched by Global Source. Soon thereafter, McCarthy founded Beneficial Growth Systems, Inc. ("BGS"), in which Blood and Eynden became involved. BGS was set up to facilitate investments with Global Source and its official address was the home Blood rented in Newark, Delaware. BGS invested a total of $495,000 in Global Source, and anticipated a "risk-free" 25% return every 35 days. Global Source, however, made its fourth and final payment to BGS in August of 1999, leaving BGS with a net loss of approximately $190,000.

In November of 1999, Blood, Eynden, and McCarthy were introduced to Frank Layon, who represented himself as an attorney centrally involved in facilitating high-yield investment programs. Soon thereafter, apparently undeterred by its failure with Global Source, BGS invested $100,000 with Layon's company "Direct-to-You Trust." Blood, Eynden and McCarthy then formed a new company, Greystone International, Ltd. ("Greystone"), in January, 2000. All of BGS's assets and liabilities were transferred to Greystone which, like BGS, had as its official address Blood's home in Newark. On January 12, 2000, Greystone invested an additional $200,000 with Layon, making the combined BGS/Greystone investment with Direct-to-You Trust $300,000. When Layon's promised returns did not materialize, BGS/Greystone demanded that its money be returned. Layon complied and, by June 19, 2000, BGS/Greystone had received all but $7,000 of its investment back.

With a purportedly renewed sense of confidence in Layon, Greystone began soliciting other investors to partake in Direct-to-You's "high-yield" investment programs

3

and procured $650,000 of investor capital throughout the year 2000 by making false representations about Layon's programs. Blood personally attracted at least three such investors by guaranteeing high rates of return "risk-free." For example, on July 19, 2000, Michael Nadeau invested $50,000 with Greystone after Blood promised a 15% return every 35 days. Although Nadeau did receive four payments totaling $29,600 between September 2000 and July 2001, the payments stopped in July, and Nadeau lost the remaining $20,400 of his investment with Greystone. Blood admitted that he did not tell Nadeau of his prior failures with the supposedly "risk-free" high-yield investment programs, and instead that he assured Nadeau that there was "no risk at all." Appx. at 653-54, 686-89.

However, before Nadeau learned of the failure of his investment with Greystone, he and Blood traveled together, pitching high-yield investment programs to various people. David Brannon and Arnold Ramsey were among the people Blood and Nadeau convinced to invest. On September 28, 2000, Brannon invested $100,000 with Greystone and then an additional $50,000 in November of the same year. Blood told Brannon that Brannon's $50,000 would be invested with an additional $50,000 that Blood himself was putting up, and asked Brannon to wire the money to Legasure International Corporation, another company owned by Blood. Rather than combining Brannon's money with his own and sending it to Layon's supposed high-yield programs as promised, Blood instead used the money to pay Nadeau for Blood's portion of an investment in an un-related Internet business that he and Nadeau were starting up. Blood did so only after telling

4

Brannon that his investment "was to be part of a pool of money that was going to be put into a secured account in a bank and not at risk, 100 percent safe." Appx. at 132. In October of 2000, Blood sent Nadeau an additional $30,000 check from Greystone which, according to Nadeau, represented an earlier investment in the aforementioned Internet business. Brannon lost the entire $150,000 he invested with Greystone.

On November 16, 2000, Ramsey wired $100,000 to Greystone after Blood assured him that "there was no risk to the investment." Like Brannon, Ramsey never received any of his money back.

On May 25, 2004, George Blood was indicted. The Grand Jury for the District of Delaware returned a twelve-count Superseding Indictment on April 5, 2005 charging the Defendant with wire fraud in violation of 18 U.S.C.§ 1343 (Counts One-Six); mail fraud in violation of 18 U.S.C. § 1341 (Counts Seven-Nine); and money laundering in violation of 18 U.S.C. § 1957 (Counts Ten-Twelve). Blood elected to go to trial and on September 27, 2005, he was convicted by a jury on all counts.

On March 13, 2006, Blood was sentenced to 78 months' imprisonment, followed by three years supervised release. The sentence was based upon a base offense level of 17 for an illegal monetary transaction pursuant to the United States Sentencing Guidelines ("USSG") § 2S1.2; an additional two-level enhancement under § 2S1.2(b)(1)(B) because Blood "knew that the funds were the proceeds of any other specified unlawful activity"; and an additional five-level enhancement pursuant to §§ 2S1.2(b)(2) and 2S1.1(b)(2)(F), because the loss exceeded $1,000,000. In sum, Blood's total offense level was 24, and,

5

because his Criminal History Category was III, the Guidelines range was 63 to 78 months.  The Court sentenced Blood to the upper end of the range, finding him to be a "serial offender and a confidence man apparently without a conscience."  Appx. at 1181.

Blood now appeals both his conviction and his sentence.  With respect to his conviction, Blood argues that it was plain error for the District Court to have failed to instruct the jury that he must have "culpably participated" in the fraudulent scheme and, additionally, that the evidence at trial was insufficient to establish that Blood knew he was participating in the overarching fraudulent scheme.  With respect to his sentence, Blood argues that the District Court erred by finding a loss amount of $1,041,000. Additionally, he argues that the District Court's imposition of sentence enhancements violated his Sixth Amendment rights because they were based upon factual findings not proven to a jury beyond a reasonable doubt.

## II.

### A.

Blood argues that the District Court erred by failing to instruct the jury on the "culpable participation" element of wire and mail fraud.  "Although we generally review jury instructions for abuse of discretion our review is plenary when the question is whether a district court's instruction misstated the law."  *United States v. Dobson,* 419 F.3d 231, 237 (3d Cir. 2005) (internal quotations and edits omitted).  We review for plain error because Blood did not properly preserve the issue at trial.  "Under the plain error standard, before an appellate court can correct an error not raised at trial, it must

6

find: (1) an error; (2) that is plain; and (3) that affected substantial rights. If all three conditions are met, an appellate court may in its discretion grant relief, but only if the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 236 (internal quotations, edits, and citations omitted).

In support of his argument, Blood relies on our recent decision in *Dobson,* where a similar instruction was given to the jury as to the essential elements of mail fraud. We vacated Dobson's conviction, finding it based on an incomplete charge. *Id.* at 241.

Dobson was a salesperson for a company called Universal Liquidators ("UL"), which purported to locate and resell surplus and liquidated merchandise. UL charged individuals a fee to become brokers who would be able to purchase discounted merchandise and resell it at a substantial profit. UL, however, had no relationships with any of the manufacturers mentioned in its marketing materials, nor did it have the means to assist brokers in the location or resale process. In short, UL was a fraud. Dobson was one of UL's sales representatives and solicited potential brokers by presenting brochures and other marketing materials which fraudulently held out UL as having the means to facilitate sales. Although Dobson testified that she was unaware that UL, overall, was a fraud or that its marketing materials were bogus, she admitted to making several false representations to prospective brokers in order to increase her sales total. Dobson was charged with mail fraud and the District Court instructed the jury that in order to convict her, they had to find that she knowingly devised or participated in a scheme to defraud,

7

acted with specific intent to defraud, and used the mails to carry out the scheme. Dobson was convicted.

On appeal, Dobson challenged the jury instruction. She asserted that there were two layers of fraud present in her case: her own misrepresentations, and UL's overarching fraudulent scheme, of which, again, she claimed she was unaware. Dobson argued that because the jury instruction did not distinguish between these two layers, the jury may have convicted her for furthering the overarching scheme by relying only on the evidence regarding her own self-generated misrepresentations. This ambiguity, in Dobson's view, was error, and to remedy it, Dobson asked that we vacate her conviction. We agreed.

In vacating Dobson's conviction we relied on our decision in *United States v. Pearlstein*, 576 F.2d 531, 545 (3d Cir. 1978), where we held that, to be convicted of mail fraud, it is not sufficient for the Government to prove merely that the defendant took part in a fraudulent scheme, but rather that he did so knowingly and "in furtherance of the illicit enterprise." We reasoned that when two layers of fraud are at issue, the relevant inquiry is not whether the defendant made *any* fraudulent statements, but whether the fraudulent statements he *did* make were in furtherance of the overarching fraudulent scheme. *Id.* at 537. Therefore, we held that when the jury is confronted with dual layers of fraud, the District Court must instruct it to find that the defendant "culpably participated" in the overall scheme.

Blood argues that, like in *Dobson*, there are two layers of fraud at issue here: his own misrepresentations to investors, and Greystone's overarching fraudulent scheme, of

8

which Blood claims he was unaware. Although Blood is correct to assert that the "culpable participation" instruction is necessary when two levels of fraud exist, this is not such a case. Unlike Dobson's statements, which were separate and distinct from UL's overarching scheme, there is no dispute that Blood's "risk-free" misrepresentations were in furtherance of the one and only scheme to defraud. Indeed, "[t]he only fraudulent scheme alleged and proven in the case at issue consisted of the false promises Blood made to induce investments into BGS and Greystone for purported placement in risk-free high-yield investment programs." Brief for Appellee at 34. Therefore, we see no error, let alone plain error, in the District Court's instruction.

Blood next argues that there was insufficient evidence to establish that he knowingly participated in BGS/Greystone's overall scheme to defraud. He asserts that there was no evidence presented at trial indicating that BGS or Greystone was fraudulently conceived and that, on the contrary, BGS/Greystone were themselves victims of Layon's misrepresentations. *See* Brief for Appellant at 57. Blood further argues that, even if the evidence had supported a finding that Greystone conducted a Ponzi scheme,[1] it was McCarthy, and only McCarthy, who was "capable of masterminding and orchestrating such a scheme" because she was "the only person authorized to write checks." *Id.* However, "[w]e must sustain the verdict if there is substantial evidence,

---

[1] A "Ponzi scheme" is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." Black's Law Dictionary (8th ed. 2004).

viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Beckett*, 208 F.3d 140, 151 (3d Cir. 2000) (internal citations omitted). Indeed, a finding of insufficiency of the evidence "should be confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002).

We are of the opinion that sufficient evidence was presented at trial from which rational jurors could have concluded, beyond a reasonable doubt, that Blood devised and participated in a scheme to defraud BGS and Greystone investors. The record clearly established that Blood promised high rates of return "risk-free" despite having previously experienced losses from the very same types of investment vehicles - vehicles that were managed by the same people who controlled the accounts in which Blood asked others to invest. Nevertheless, Blood testified that he genuinely believed in the high-yield programs he pitched. However, the guilty verdict reveals that the jury simply rejected Blood's contentions that his promises of "risk-free" investment were made in "good faith." We believe sufficient evidence supported this conclusion. Finally, with respect to Blood's contention that only McCarthy was capable of devising and "orchestrating" the fraudulent scheme at issue, the evidence presented at trial revealed that both BGS and Greystone were run out of Blood's home, that Blood controlled the paperwork, and that he had significant contact with Global Source and Layon. *See* Appx. at 1125-35, 1160-61. We find that the evidence available to the jury was sufficient for a guilty verdict and affirm the District Court's holding with respect to Blood's conviction.

**B.**

10

With respect to his sentence, Blood argues that the Government presented insufficient evidence to support finding a loss of $1,041,000. We will "review factual findings relevant to the Guidelines for clear error and . . . exercise plenary review over [the] District Court's interpretation of the Guidelines." *United States v. Grier,* 475 F.3d 556, 561 (3d Cir. 2007) (en banc).

First, Blood argues that "an unknown portion of the Greystone investors' losses were legitimate as their contributions were gained through good-faith beliefs in the investment programs that Greystone offered." Brief for Appellant at 67-68. In other words, Blood maintains that, in the early stages of Greystone's investments with Layon, Blood and his co-conspirators genuinely believed that investing with Layon would generate profits for Greystone investors. In support of this notion, Blood contends that the District Court did not make any findings of fact as to when investors contributed money to Greystone, or what Blood's beliefs were at the time invitations to invest were made. However, these arguments are simply an attempt to relitigate Blood's conviction, because, implicit in the jury's verdict was that he knew that his investments with Layon could not produce extraordinary rates of return without substantial risk.

Next, Blood argues that a "more searching and individualized inquiry into [his] involvement with the losses caused by Greystone is necessary to decipher the amount of fraud loss that he should be held accountable for under the guidelines' reference to a 'jointly undertaken criminal activity.'" Brief for Appellant at 73. Blood claims that the record neither reveals his role in the conspiracy nor the scope of the criminal activity that

11

he agreed to jointly undertake. We disagree. The conspiracy that Blood agreed to join – and it is evident from the jury verdict that he did so agree – was the jointly undertaken operation of Greystone as a vehicle to solicit investments based on fraudulent representations. As set out in *United States v. Collado*, the loss amount attributable to Blood is not limited to his own acts, but rather to those acts which were "reasonably forseeable in connection with the criminal activity the defendant agreed to undertake." 975 F.2d 985, 995 (3d Cir. 1992) (quoting U.S.S.G. § 1B1.3). There is sufficient record evidence supporting the conclusion that Blood worked in concert with Eynden and McCarthy to fraudulently procure investment capital. *See, e.g.,* Appx. at 963-70, 1160-63.

Blood also argues that his "sentencing calculus should not include any of the losses directly attributable to Layon" because Layon's conduct was not "in furtherance of the criminal activity jointly undertaken," nor was it "reasonably forseeable in connection with that criminal activity," and therefore it is not relevant conduct. *See* Brief for Appellant at 74 (quoting U.S.S.G. § 1B1.3, Application Note 1.). In support of this argument Blood points to the Presentence Report which states: "There does not appear to be any evidence that Blood (or Carol [McCarthy] or Bill [Eynden]) knew that Layon was a complete fraud (and indeed, the fact that their companies lost hundreds of thousands of dollars they sent to him, seems to argue they were victims)[.]" PSR at 5 n. 2. Although Blood is correct to assert that Layon was not proven at trial to be one of Blood's co-conspirators, this fact does not make Blood eligible for a deduction in the loss total.

12

Application Note 11 in U.S.S.G. § 2F1.1(b)(1) "definitively rejected adjusting the 'loss' itself downward to reflect other causes beyond the defendant's control." *United States v. Kopp*, 951 F.2d 521, 531 (3d Cir. 1991). However, "[t]o the extent actual loss had other, more proximate causes, a discretionary downward departure but not a mandatory loss adjustment *might be* appropriate." *Id.* (emphasis added) (internal quotations and edits omitted). In other words, the District Court *could* have concluded that Blood deserved a downward departure due to misrepresentations Layon may have made to Blood, but it was under no obligation to do so. And, as is clear, Blood did not move for a downward departure on these grounds.

Finally, Blood contends that the District Court erred by imposing sentencing enhancements based upon factual findings that were not proven to a jury beyond a reasonable doubt in violation of his 6th Amendment right to a jury trial. However, "[t]here can be no question, in light of the holding of [*United States v.*] *Booker*[, 543 U.S. 220 (2005)], and the reasoning of *Apprendi*[ *v. New Jersey*, 530 U.S. 466 (2000)], that the right to proof beyond a reasonable doubt does not apply to facts relevant to enhancements under an advisory Guidelines regime." *Grier*, 475 F.3d at 565.

## III.

For these reasons, we will AFFIRM the Judgment and Commitment Order of the District Court.

_____

13